[Crim. No. 1695. First Appellate District, Division One.—January 19, 1934.]

## THE PEOPLE, Respondent, v. ALBERT TINNIN, Appellant.

Nathan C. Coghlan, Vincent W. Hallinan and Walter C. Frame for Appellant.

U. S. Webb, Attorney-General, and Seibert L. Sefton and William F. Cleary, Deputies Attorney-General, for Respondent.

KNIGHT, J.—While walking home from a theater in the Ingleside district, San Francisco, about 10 o'clock at night, a Mr. and Mrs. Louw found the lifeless body of an elderly woman lying in the street close to the curb on Kenwood Way, near the junction of Fairfield Way. Just before finding the body their attention was attracted by the erratic manner in which a big automobile was being driven in the vicinity, and it was believed at first that the woman had been struck and killed by the automobile while she was attempting to cross the street; but subsequent investigation by the police proved her identity to be Mrs. Jessie Scott Hughes, and that she had been murdered in the garage of her home about a block distant from the junction of said

streets and her body then placed in said automobile, driven to the location where it was found, and cast into the street in a position to simulate a traffic accident. Approximately five weeks later Albert Tinnin, Frank J. Egan and Verne Doran were charged jointly by indictment with having committed the crime. They demanded separate trials, and a severance was granted as to Doran, but denied as to Tinnin and Egan; and upon trial the latter two were found guilty of murder in the first degree. The jury fixed the penalty at life imprisonment and sentence was imposed accordingly, following which they were committed to the state prison and have been since confined there in execution of said sentence. At the trial they were represented by separate counsel, and they took separate appeals from the judgments of conviction and the orders denying their motions for new trial. Egan, however, did not perfect his appeal, and on November 28, 1933, after several continuances granted pursuant to stipulation of the attorney-general, Egan's appeal was dismissed. (*People* v. *Egan,* 135 Cal. App. 479 [27 Pac. (2d) 412].) We have before us for determination, therefore, only the appeal of Tinnin, the record of which includes more than 2,300 pages of reporter's transcript, and approximately 360 pages of printed briefs.

The evidence presented by the prosecution shows that the murder was instigated and planned by Egan, and that under his direction those plans were carried out by Tinnin and Doran, Egan assisting therein, although not present at the time the acts of violence were committed. Testimony to that effect was given at the trial by Doran who was called as a witness for the People. Admittedly, Doran was an accomplice; and it is now contended as a ground for reversal that his testimony connecting appellant with the commission of the crime was not corroborated in the manner required by law.

Section 1111 of the Penal Code, upon which the foregoing contention is based, provides that a conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and that the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. The provisions of said code section have been under review

many times and consequently the law has become well settled as to the extent and character of proof necessary to satisfy the legal requirements of said code section. The recent case of *People* v. *Negra,* 208 Cal. 64 [280 Pac. 354], cites many of the earlier decisions, and in restating the rules established thereby the court points out that while the corroborating evidence must do more than create a suspicion of guilt, it is nevertheless sufficient even though it "be slight and, when standing by itself, entitled to but little consideration. (*People* v. *McLean,* 84 Cal. 480 [24 Pac. 32].)" And continuing, the court says: "The law does not require that the evidence necessary to corroborate the testimony of an accomplice shall tend to establish the precise facts testified to by the accomplice; and strong corroborative testimony is not necessary to support a judgment of conviction founded on the testimony of an accomplice. Even though circumstantial and slight, the evidence is, nevertheless, sufficient if it tends to connect the accused with the commission of the offense. (*People* v. *Martin,* 19 Cal. App. 295 [125 Pac. 919].) The defendant's own statements and admissions, made in connection with other testimony, may afford corroboratory proof sufficient to sustain a verdict. (*People* v. *Armstrong,* 114 Cal. 570 [46 Pac. 611]; *People* v. *Sullivan,* 144 Cal. 471, 473 [77 Pac. 1000].) It is not necessary that the corroborating evidence should go so far as to establish by itself, and without the aid of the testimony of an accomplice, that the defendant committed the offense charged. (*People* v. *Solomon,* 6 Cal. Unrep. 305 [58 Pac. 55].)" The more recent case of *People* v. *Davis* 210 Cal. 540 [293 Pac. 32], holds substantially to the same effect. Furthermore, it has been held that such independent evidence may consist of contradictory statements made by the accused, or his silence in the face of accusatory statements, or of false statements made with respect to matters connected with the commission of the crime (*People* v. *Taylor,* 70 Cal. App. 239 [232 Pac. 998]); that it may consist also of evidence of flight (*People* v. *Armstrong, supra*), or of circumstances showing that immediately after the commission of the crime the accused assumed a false name (*People* v. *Cleveland,* 49 Cal. 577). In fact, says the court in *People* v. *Nikolich,* 93 Cal. App. 356 [269 Pac. 721], the entire conduct of the accused may be looked to for corrobo-

rative circumstances, and if therefrom his connection with the commission of the crime may be fairly inferred, the corroboration is legally sufficient. It is also well settled that where the commission of a crime grows out of a conspiracy, and the unlawful enterprise is established either by direct or circumstantial evidence, every act or declaration of each member of the confederacy in pursuance of the original concerted plan and with reference to the common object is, in contemplation of law, the act and declaration of them all, and is therefore original evidence against each of them, it being deemed in law that one who thus enters into a common purpose or design is a party to everything which may be done or said by the others in furtherance of the conspiracy (*People* v. *Sampsell,* 104 Cal. App. 431 [286 Pac. 434]; *People* v. *Lorraine,* 90 Cal. App. 317 [265 Pac. 893]); furthermore, that the common design of the criminal enterprise may extend beyond the point of the commission of the act constituting the crime for which the alleged conspirators are on trial (*People* v. *Opie,* 123 Cal. 294 [55 Pac. 989]; *People* v. *Mazzurco,* 49 Cal. App. 275 [193 Pac. 164]; *People* v. *Holmes,* 118 Cal. 444 [50 Pac. 675]; *People* v. *Rodley,* 131 Cal. 240 [63 Pac. 351]), and that the question as to when the design is accomplished and abandoned depends on the facts and circumstances of each case and the nature and purposes of the conspiracy and is one for the determination of the jury. (5 Cal. Jur. 523.)

In the present case the prosecution claimed and introduced evidence to prove that the purpose of the criminal enterprise extended beyond the act of killing Mrs. Hughes and included a plot also to escape punishment therefor by inducing the authorities to believe that Mrs. Hughes had been the unfortunate victim of a traffic accident. It will be seen, therefore, that the field of evidence over which the jury had the right to look for corroborative circumstances tending to connect the appellant with the commission of the crime was unusually broad; and after examining the record of such evidence, we are convinced that the affirmative conclusion reached by the jury upon this issue of fact is not lacking in evidentiary support.

At the time the crime was committed and for many years prior thereto Egan held the office of public defender of the city and county of San Francisco. Tinnin and Doran were

young men with criminal records with whom Egan became acquainted through the discharge of the duties of his office and afterwards maintained a friendly relationship. In 1916 he successfully defended Tinnin on a charge of robbery; afterwards Tinnin was convicted elsewhere on two felony charges, first in 1920, under another name, in Tehama County for an assault to murder a woman named Cockroft, and again in 1923, in the federal court, for illegally harboring aliens. Egan was a witness for him at the trial in Tehama County. In September, 1923, Tinnin commenced serving the penitentiary sentence for the crime there committed, and on February 1, 1932, mainly through Egan's efforts, he was released on parole from Folsom prison, following which Egan treated him as a companion, aiding and assisting him in various ways. One of the conditions of his parole was that he reside in Oakland, but two months later and on March 27, 1932, after consulting Egan, he took up his abode in San Francisco at the Blackstone Hotel on O'Farrell Street; and a month thereafter he was arrested in connection with the Hughes murder. In 1924 Egan successfully defended Doran on a "gun" charge, and five years later defended him again on a charge of burglary. The trial resulted in a conviction, but Egan obtained a suspension of the five-year penitentiary sentence and Doran was released on probation on condition that he serve one year in the county jail. When Doran was released from jail Egan continued a friendly association with him, Doran having served on a number of occasions as the chauffeur for Egan and his wife and children.

Egan's motive for the crime, upon which the case against Tinnin also centers, was, so the evidence shows, to obtain money to relieve himself from financial difficulties in which he had become involved and to prevent exposure of certain unprofessional and unlawful acts committed by him in the course of his private professional practice. The facts relating thereto were established by testimony independent from that given by Doran. It appears therefrom that Mrs. Hughes was an old-time friend of Egan's. For several years he had been her legal adviser. She lived alone in a dwelling on Lakewood Avenue, a short distance from where her body was found. Egan visited her home on numerous occasions, and she reposed in him the utmost confidence and

trust. She carried life insurance aggregating $2,400 made payable to her estate, and in 1927 Egan induced her to substitute his name as beneficiary. He also had her convey without consideration to one Kazaka a piece of property, which, under Egan's direction, Kazaka immediately mortgaged to a bank for $1750. Out of that sum Kazaka paid Egan $500 and kept the rest in satisfaction of a loan previously made to Egan. Later, under Egan's direction, the property was sold subject to the bank mortgage to one Sweeney. The purchase price consisted of a down payment of $200 in cash and a second encumbrance of $1550, both of which were given directly to Egan. About the same time also Egan was being constantly pressed for the payment of a promissory note for some $8,000 which he had given to cover a sum illegally withdrawn by him for his own use by means of a series of unlawful transactions from the funds of an estate, in the administration of which he was interested in a professional capacity, the holder of said note eventually obtaining as security an assignment of the Sweeney deed of trust covering the Hughes property and a policy of insurance on Egan's life. Furthermore, a bank foreclosed on Egan's home to satisfy a loan of $9,000; and another bank was demanding payment of a $1500 note given for money borrowed. In February, 1931, Egan made application to a different life insurance company for a $10,000 policy on the life of Mrs. Hughes, payable to him, which the company refused to issue. However, it did issue one for $5,000 payable to the estate of Mrs. Hughes, and subsequently Egan induced the company to issue a second policy for the remaining $5,000. The premiums were paid by Egan, and a month after the issuance of the second policy he caused his name to be substituted as beneficiary in both policies. Meanwhile Mrs. Hughes had grown suspicious about the handling of her property affairs, and began to lose confidence in and distrust Egan. She called at his office frequently to see him, but he evaded her. Egan's office stenographer testified that Egan had thus tried to avoid seeing Mrs. Hughes for two or three years prior to her death; that upon learning she was waiting in his office he would remain absent until she had gone. Continuing, the witness testified that Mrs. Hughes' efforts to see Egan grew more persistent during the few months preceding her death; that she would wait in vain

for hours in his office to see him; that only a few days prior to her death she called at the office and when told that Egan was not in she became hysterical, exclaiming that she had more right than anyone else to come to his office— "that she wanted her money"; that as soon as she left the office on this occasion Egan returned and excitedly wanted to know what Mrs. Hughes had said. The witness further testified that on the day preceding Mrs. Hughes' death, the holder of Egan's $8,000 note visited Egan's office demanding payment.

On that same day, Thursday, April 28, 1932, so the evidence shows, Egan revealed to Tinnin and Doran his determination to put Mrs. Hughes out of the way, and the plans he had laid to accomplish this purpose. In this regard Doran testified that Egan in expressing such determination complained of the constant visits of Mrs. Hughes to his office, stating she would arrive there in the morning, stay until lunch, return and remain until the office closed; that the only time he could visit his office was when she went out to lunch; that Egan also related how her presence there "upset" him, stating she had threatened to expose him before the bar association, and at times he had been "tempted to kill her". Continuing, Egan told them, according to Doran's testimony, that he had previously planned "to knock Mrs. Hughes unconscious and run over her" but was fearful of doing so himself because suspicion would be directed toward him. For that reason, so Doran testified, he and Tinnin agreed to carry out Egan's plan for him. Continuing, Doran stated that Egan went on to explain that it would be easy for them, Tinnin and Doran, to get into Mrs. Hughes' house; that it was his custom to phone her whenever he was going out there and she always had the garage doors in the basement of her home open so that he could drive in without alighting outside; that by so phoning he could obtain entrance for them and that they could then "knock her unconscious and run over her and make it appear as though it was a hit and run case", stating that he "was experienced in handling cases of that kind and knew all about them". Tinnin suggested, so Doran testified, that Egan ask Mrs. Hughes to meet him on a corner and that while she was crossing the street he, Tinnin, could run over her; but Egan rejected the proposition with the statement

that he had "planned this out before"; also that something was said about renting a car for the purpose of carrying out the plans, but Egan said such cars were "too light"— that he wanted a heavy car; that Egan then directed him to borrow a car from a man named Postel, a friend of Egan's, reminding Doran at the time that he, Egan, was the one that got him, Doran, out of jail and was the one that could keep him out of jail. Accordingly, the next morning Doran borrowed Postel's car, telling Postel that Egan wanted it. He drove it to his sister's home, where he lived, and parked it in the street in front of the house. Soon afterwards Tinnin and Egan drove up, and talked with Doran about the car; and later during the day, so Doran testified, two more conferences were held to complete the plans for the crime, one on the street, near the Blackstone Hotel while sitting in Egan's car, and the other late in the afternoon when Tinnin and Doran drove out to Mrs. Hughes' home, accompanied most of the way by Egan; and pursuant to final arrangements they all met that night in Egan's office at 8 o'clock, Doran driving there in Postel's car. Their activities thereafter, as shown by Doran's testimony, were as follows: Egan phoned Mrs. Hughes he was going out to see her and bring with him a couple of friends, and that they would leave very soon. It was understood between the three men, however, that Egan would not go along, but instead would attend a public boxing entertainment at Dreamland Rink in company with a Dr. Housman; and he instructed Tinnin and Doran to tell Mrs. Hughes, when she inquired as to his absence, that on the way out there he stopped at the theater to reprimand his boy and send him home, and he would be there later. Egan then instructed them to phone him just before they reached Mrs. Hughes' home, and stated he would thereupon again phone Mrs. Hughes he would be there in a few minutes. Tinnin and Doran followed these instructions, and accordingly upon their arrival at the Hughes home the garage doors were open and they drove in. Mrs. Hughes closed the doors and turned on the lights. Tinnin, being acquainted with Mrs. Hughes, as will hereinafter appear, introduced Doran. Mrs. Hughes asked where "Frank" was, and they told her as instructed that he got out at the theater and would be there soon. While waiting supposedly for the arrival of

Egan, Mrs. Hughes showed them around the basement, talking about different matters, and at the opportune time Doran seized her by the arms from behind and Tinnin struck her violently with his fists, rendering her unconscious. Her body was then laid on the floor in front of the car, and while Tinnin held it in position by placing his foot against it and bracing his back against the garage wall, Doran drove the car upon her body, killing her. Thereupon they put the body in the tonneau of the car, Doran washed the garage floor with the basement hose, and backed the car out of the garage. Tinnin closed the garage doors, got in the front seat with Doran and they drove away. Soon after leaving the garage Tinnin crawled over into the tonneau and hurled the body into the street. Thereupon they drove the car back to Postel's garage, left it there and went to Tinnin's hotel. Later they were joined by Egan, and after visiting a restaurant and driving around town, they obtained a morning paper and Doran was driven home. Egan lived with his family in a dwelling not far distant from Mrs. Hughes' home, but on the night of the murder he slept with Tinnin in the latter's room at the Blackstone Hotel, Tinnin having borrowed some night clothes for Egan from a guest at the hotel named Miss Sills. Tinnin and Egan so admitted at the trial.

The police investigation under the direction of Captain Dullea began within a few hours after the finding of Mrs. Hughes' body; and Egan, through his friendly offices with the department, sought, as originally planned, to keep in close touch therewith; but as the investigation progressed the three men became greatly alarmed, and in a few days Egan and Doran disappeared completely under suspicious circumstances; and Tinnin admitted at the trial that he too tried to conceal his whereabouts and was about to leave for the country and go into hiding when apprehended by the police. As to these subsequent events the evidence shows that early Saturday morning, the day following the murder, the police discovered the imprints of the automobile tire treads on the dampened floor of the Hughes garage. That same morning, according to Doran, the three men met by appointment in a park near Egan's office and when Egan observed Tinnin was wearing the same cap and Doran the same hat each had worn the night before, he purchased new

hats for them. The fact that Tinnin discarded his cap and was wearing a new hat on the day following the murder was established also by Miss Sills, who testified that at the same time she noticed Tinnin's thumb was badly swollen and inflamed; and when she called his attention to it he stated he had been in a fight. No testimony was introduced at the trial, however, to show he had been engaged in any conflict. That same Saturday morning also, about 9 o'clock, Egan called at Captain Dullea's office under the pretense of responding to a phone message from that office; but there had been no such message and he was so informed. The conversation then turned to the death of Mrs. Hughes and Egan accompanied Captain Dullea to the coroner's office, explaining he had acted as Mrs. Hughes' legal adviser a number of years, that she was estranged from her family, and he had often cautioned her about going out at night on account of the danger of being the victim of a "hit-and-run" accident. He also stated Mrs. Hughes carried about $2,000 life insurance and left a will naming him as executor and beneficiary, and that he would take care of all funeral arrangements. Later during the day he phoned Captain Dullea requesting further information as to the developments in the case, and was informed there were none. He then spent the afternoon and that evening with Tinnin. Both so admitted at the trial, the explanation given therefor being that Egan desired to entertain Tinnin and had done so by driving him around town, dining him, and showing him different places of interest and amusement. About 12 o'clock that night Egan parked his car for the night in a garage near Tinnin's hotel and, as he claimed, rode home in a jitney bus. Tinnin spent most of Sunday afternoon and evening with Doran, so Tinnin admitted at the trial. On Monday morning Doran met Egan on the street in company with Dr. Houseman in response to a phone message from Egan, at which time Egan informed him, so Doran testified, about the activities of the police, stating that detectives had taken imprints of the tire treads of Postel's car. Egan then suggested giving Postel $50 and have him replace the tires with new ones, or that they purchase the car from him and have Doran drive it into the country and conceal it. As soon as the conference ended Doran walked down the street, so he testified, and in talking

with a friend about the death of Mrs. Hughes was told that the police had seized Postel's car and arrested Postel; whereupon Doran went into hiding in the home of a friend named Mrs. Snyder. That same afternoon Egan again phoned Captain Dullea asking "what all the investigation was about"; and Dullea countered by asking Egan what he meant. Egan then explained that newspaper reporters had attempted to interview him about the case; and he closed the conversation by asking Captain Dullea if he "was wanted for anything" and was informed that he was not. About 7 o'clock that night Tinnin and Egan were seen together talking in front of the Flood building at Powell and Market Streets, and at 7:55 Tinnin registered at the National Hotel on Market Street under the fictitious name "T. Cole". He took none of his belongings from the Blackstone Hotel except a music case containing a saxophone which he left at the Strand Hotel in the room of a friend named Yellavich, who was employed as a street-car conductor; and at 9 o'clock Egan again phoned Captain Dullea at his office, saying, under great stress of excitement, that he was "being held" by two strange men. Captain Dullea asked where he was phoning from, and he replied, after some hesitation, "from the phone booth in the Ferry Building", explaining that he had freed himself temporarily under the pretense that he wanted to phone to his wife. He then exclaimed excitedly: "You know I had nothing to do with the Hughes case. I was at the fights that night" and abruptly ended the conversation in the middle of a sentence by hanging up the phone. Immediately following the phone message he disappeared; and subsequent investigation proved that his assertion of the circumstances under which he pretended to phone and his restraint by two men were based on pure fabrication.

Tuesday night Tinnin remained with Doran at Mrs. Snyder's, and he admitted at the trial that the next morning he made an effort to obtain his belongings from the Blackstone Hotel without disclosing his whereabouts. In this regard Miss Sills testified that Tinnin asked her to meet him on the street, stating he had something important to tell her; that he refrained from giving his name over the phone, saying: "Don't ask who I am, you recognize my voice, don't you?"; and after making the appointment he failed to keep

it. That same day he boarded Yellavich's street-car and asked Yellavich to bring his saxophone case to the car barns about 4 o'clock, explaining that he did not want to call at Yellavich's room for it himself because he was afraid of being arrested in connection with the Hughes case. He also told Yellavich he left the Blackstone Hotel for the same reason. Yellavich arrived at his room at noon to get the saxophone case, but before he left the police called, and upon learning of the appointment with Tinnin at the car barns about 4 o'clock, the police went there and arrested Tinnin. At the trial Tinnin admitted that he intended after obtaining his saxophone to leave at once for some place in the country where he could not be found. Following his arrest he was questioned by Captain Dullea and he denied having any acquaintanceship whatever with Doran. This statement was admittedly false; and being asked why he left the Blackstone Hotel said: "Well, I will tell you; when I read the paper on Monday night and read about the disappearance of Frank Egan, I became alarmed. I had been friendly with him, and on account of having a record I was afraid I would be mixed up in connection with it, so I thought the best thing I could do was to check out of the hotel." Captain Dullea then asked him how that could be true when he registered at the National Hotel at 7:55 that night and as a matter of fact Egan did not disappear until after his phone message to the detective bureau at 9 o'clock, and the newspapers announcing his disappearance were not on the street until about 11 o'clock; and Tinnin replied: "Well, I am not going to talk any more, I do not want to say anything. I was told enough not to talk. . . . It is my experience to always keep your mouth shut"; and although several accusatory statements were made thereafter by the officers in his presence implicating him in the Hughes murder he remained silent. On Thursday morning, the day following Tinnin's arrest, Doran left the city and went into hiding in the country. On May 7th, five days after Egan mysteriously disappeared, he was found in a San Francisco sanatorium; and ten days later Doran returned to the city, surrendered to the police, requested that his probation on the burglary conviction be revoked, and was sent to the state prison; and on June 4th he made the confession which two days later brought about the finding of the indictment.

Tinnin's defense was an alibi, whereby he sought to establish that he spent the entire evening, on the night of the murder, in the apartment of a woman trying to interest her in financing a contrivance invented by Yellavich, later meeting Egan at the Blackstone Hotel, where admittedly they spent the night together.

The record also shows that Doran's story of the circumstances under which he obtained the use of the Postel car was fully supported by Postel. It was a large, heavy, old model Lincoln touring car with curtains inclosing the tonneau, but leaving the driver's seat open to view, and was equipped with a large trunk and two spare tires in the rear and a spotlight in front; consequently it was easily described and identified; and Tinnin's connection therewith was established by the testimony of Doran's brother-in-law. He testified he was at the home of Doran's sister when Tinnin and Egan drove up in the latter's car shortly after Doran obtained possession of the Postel car; that Tinnin came across the street to talk with Doran and pointing at the Postel car said to Doran: "Is that it?" and Doran replied in the affirmative; that Doran and Tinnin then went over and talked with Egan, who remained seated in his own car, and soon afterwards Tinnin and Egan drove away. Doran's testimony was further substantiated by the testimony of a Mrs. Jacks, who lived neighbor to Mrs. Hughes and saw the Postel car as it was backed out of the Hughes garage and driven away by two men on the night of the murder. In so testifying she stated that about 9:30, while standing on the front sidewalk near the Hughes home, she heard a noise inside the Hughes garage and believing Mrs. Hughes was about to come out and water the lawn as was her custom, she walked toward the garage to greet Mrs. Hughes, but upon observing a man standing inside with his back toward the doorway she withdrew; that immediately afterwards she heard the garage doors slam and saw the big touring car with curtains drawn as far as the driver's seat back into the street and as it was driven away rapidly she observed that the man she had seen standing in the doorway was occupying the front seat with the driver. The Louws also identified the Postel car as the one they had seen just before they found the body. It passed and repassed them several times in such a manner as to

arouse their curiosity and apprehension. The last time it was traveling without lights and at a speed of about sixty miles an hour. Furthermore, the treads of the tires of Postel's car fitted the imprints made on the floor of the Hughes garage; and strands of Mrs. Hughes' hair and other evidences of crime were found in the tonneau of the car when it was seized by the police following the murder.

At the trial Tinnin and Egan admitted having visited Doran at his sister's home on the morning of the day of the crime, but denied positively having seen him thereafter at any time that afternoon or night, as claimed by Doran. The stories told by Tinnin and Egan as to their movements that afternoon, however, were proved false by disinterested witnesses whose testimony fully corroborated Doran's testimony that he was in their company twice that afternoon, first on the street in Egan's car near the Blackstone Hotel and again toward evening when they made a preliminary visit to Mrs. Hughes' home in the Postel car. As to the meeting near the Blackstone Hotel, an acquaintance of Doran's named Whissel testified he saw Doran sitting in an automobile with another man at the place mentioned; that he stopped and conversed with Doran, who introduced his companion as Tinnin; and that in response to an inquiry Doran told him the automobile they were occupying belonged to Egan, who at the time was temporarily absent phoning in a near-by store. As to the preliminary visit to Mrs. Hughes' home, Doran testified the ostensible purpose thereof was to have them deliver to Mrs. Hughes an envelope containing $5 which Egan was sending her to pay for some flowers she had purchased, Egan accompanying them most of the way; whereas evidently the real purpose was to acquaint Tinnin and Doran with the interior of her home and its surroundings so that they could better carry out the plans for the murder that night. Continuing, Doran testified that when they reached the block where Mrs. Hughes lived Egan got out of the car and awaited their return; that when they reached Mrs. Hughes' home Tinnin went inside to deliver the money, remaining there about twenty minutes; that while he waited for Tinnin in the Postel car in front of the Hughes home two women walked by, from whom he tried to conceal his features with his hands; that after Tinnin came out of the house they drove

back and picked up Egan. These women positively identified Doran at the trial as the man they had seen sitting in the automobile. And another woman witness living close by was produced who positively identified Egan as the man she had seen standing on the sidewalk awaiting their return. She also described the Postel automobile as the one which was used on that occasion. In this regard she stated that her attention had been attracted to Egan by his strange actions; that he paced up and down the sidewalk, stopping now and then to peer down Lakewood Avenue toward Mrs. Hughes' home; that on account of his suspicious movements she became alarmed and took particular note of his clothing and personal features; that when the automobile drove up he seemed somewhat confused about entering the back seat, but just then two other machines approached and Egan and the automobile he was about to enter hurriedly disappeared.

There are numerous other corroborative circumstances disclosed by the mass of evidence adduced at the trial which might be added to the above in further support of the jury's conclusion that Doran's testimony was corroborated by independent facts and circumstances which tended to connect Tinnin with the commission of the crime; but it would seem unnecessary to continue on in view of the fact that the circumstances already set forth appear to be amply sufficient to bring the case within the legal requirements of the statute.

■ The trial court's ruling denying appellant's motion for a separate trial is assigned as error. The code section bearing upon this subject provides that when two or more defendants are jointly charged with a public offense, whether felony or misdemeanor, "they must be tried jointly, unless the court order separate trials" (Pen. Code, sec. 1098); and it has been held repeatedly that a defendant so charged is not entitled to a separate trial as a matter of right (*People* v. *Rocco,* 209 Cal. 68 [285 Pac. 704]); that the question of severance is one which must be left necessarily to the determination of the trial court and that its ruling becomes the proper subject of review only when it appears that there has been a clear abuse in the exercise of sound discretion. (*People* v. *Perry,* 195 Cal. 623 [234 Pac. 890]; *People* v. *Erno,* 195 Cal. 272 [232 Pac. 710]; *People* v. *Nelson,* 90 Cal.

App. 27 [265 Pac. 366]; *People* v. *Swoape,* 75 Cal. App. 404 [242 Pac. 1067]; *People* v. *Anderson,* 75 Cal. App. 365 [242 Pac. 906].) ▮ Furthermore, the law is well settled that on appeal the question of whether there has been an abuse in the exercise of discretion must be determined from the facts and circumstances as they were presented to the trial court at the time its order was made, and not from what afterwards transpired at the trial. (*People* v. *Erno, supra; People* v. *Wilson,* 76 Cal. App. 688 [245 Pac. 781].)

▮ No circumstances were presented here from which it could be reasonably concluded that the denial of appellant's motion amounted to an abuse of discretion. It is true that in cases of this kind, where two or more persons are charged jointly with the commission of a crime, it frequently happens that damaging testimony, admissible against one defendant and not admissible against the others, is received in the case; and that despite the limitation placed upon the application thereof to the one to which it is referable, such testimony may carry with it an unfavorable effect equal to a confession. But as pointed out in the following cases, even though it appears that such situation may arise, a defendant is not entitled for that reason alone to a separate trial: *People* v. *Perry, supra; People* v. *Booth,* 72 Cal. App. 160 [236 Pac. 987]; *People* v. *Erno, supra,* and see, also, cases above cited.

▮ The jury was kept together in charge of court officers, and before the evidence closed a woman juror became ill. A hearing to ascertain her condition was conducted by the court in the absence of the other jurors, as a result of which the court found said juror was unable to continue serving as such; and pursuant to the authority granted by sections 1089 and 1123 of the Penal Code she was discharged and an alternate juror substituted. Appellant contends that the court's finding is unsupported, that in conducting the hearing the court violated certain rules of evidence, and that it was without authority to discharge said juror because she did not ask to be relieved, nor testify at said hearing. There is no merit in any of these contentions. The statute doubtless contemplates a summary hearing, it being held in this regard that in order to determine whether a juror, by reason of some illness, is unable to further discharge his duties as such, it is not necessary to take testimony in the

manner required judicially to establish a controverted proposition; that the juror's appearance before the court, without the aid of such testimony, may itself be sufficient proof thereof. (*Ex parte McLaughlin,* 41 Cal. 211 [10 Am. Rep. 272]; 8 Cal. Jur. 395.) In the present case the officers in charge of the jury testified that during court adjournments the juror was afflicted on several occasions with severe attacks of hysteria, during which she waved her arms wildly, screamed and conducted herself generally in an uncontrollable manner; and it was shown by the testimony of her husband and her attending physician that on account of certain major operations she had undergone she was subject to such spells during which she lost self-control, at times threatening self-destruction. And evidently the reason the juror was not called upon to testify was because of her then nervous condition. Under the circumstances stated, to allow or compel her to continue as a juror in the case would have been not only grossly unjust to the juror and to the People and the defendants, but doubtless would have imperiled the verdict. Therefore the court's action in excusing the juror was manifestly proper.

Over appellant's objections, and for the purpose of showing a close relationship between Tinnin and Egan, the prosecution introduced in evidence a portion of the transcript of Tinnin's preliminary examination on the robbery charge, from which it appeared that Egan acted as his attorney; also a portion of the transcript of testimony taken at the Tehama trial, from which it appeared that Egan appeared there as an alibi witness for Tinnin; also the "ticket of leave" granted Tinnin when he was released on parole from Folsom prison, which specified the condition that he should reside in Alameda County. In view of the prosecution's claim of conspiracy, upon the existence of which the case against Tinnin depends, we are of the opinion that for the purposes intended the court did not err in admitting the evidence. No allusion in connection therewith was made to any prior conviction of felony, and even though such inference were drawn by the jury from the transcript in the Tehama County case, it cannot be said that such inference operated to appellant's prejudice because afterwards he voluntarily became a witness in his own behalf,

and thereby allowed the prosecution on cross-examination to go into the matter of said prior conviction. Nor does it appear that the cross-examination with reference thereto extended beyond the limitation of the rule governing matters of that kind (*People* v. *La Verne*, 212 Cal. 29 [297 Pac. 561]; *People* v. *Chin Hane*, 108 Cal. 597 [41 Pac. 697]; *People* v. *Oliver*, 7 Cal. App. 601 [95 Pac. 172]), for having voluntarily offered himself as a witness, appellant's credibility as such was subject to impeachment the same as any other witness. (*People* v. *La Verne, supra.*) It follows that since the evidence complained of was admissible for the purpose mentioned, the assistant district attorney was within his rights in referring to the same in his argument in the light of such purpose.

 Appellant assigns as error also numerous rulings of the trial court on the admissibility of evidence, and instances of alleged misconduct on the part of the assistant district attorney during the presentation of evidence and in his argument to the jury. After having given full consideration to all of the points urged under this assignment, and the portions of the record upon which they are based, we are of the opinion that neither collectively nor separately do they furnish grounds for reversal. The distinctive nature of the points urged and the different subjects to which they relate make it impossible to deal with them collectively; and to discuss them singly, there being some thirty in all, would carry this opinion to an interminable and unnecessary length; consequently no attempt will be made to pass upon them separately. It may be that on technical analysis a few of the trial court's rulings on matters of evidence are subject to some criticism, but no one of them reaches the point of prejudicial error. And with respect to the charges of misconduct, it may be stated generally that although the attitude of the assistant district attorney during the course of the trial was at times aggressive and persistent, none of the specific acts complained of can be said to fall within the classification of prejudicial misconduct; nor do any of the remarks made by him during the presentation of evidence or in his arguments to the jury call for reversal. In this latter regard, the record shows that throughout the trial the assistant district attorney was made the subject

of a bitter, personal attack on the part of counsel for the defendants. His motives, integrity and honesty of purpose were constantly assailed; also such extraneous personal matters as racial affiliations and religious beliefs were time and again injected into the case by counsel for defendants. In fact, the record shows an obvious attempt on their part to vex, aggravate and humiliate him. It is not surprising, therefore, that under the stress of such provocation he felt called upon at times, as a matter of self-respect, to reply to some of the assaults upon his character. But the record shows that in doing so he confined his remarks to his own defense, and carefully refrained from making any attack upon the defendants on trial. Eventually, during his closing argument the interruptions by counsel for defendants became so vexatious, persistent and unnecessary that the trial court, after repeated warning, and so that the trial might proceed in an orderly and respectful fashion, was obliged to adjudge counsel for Egan guilty of contempt of court; and the court's action in doing so is assigned as error and misconduct on the part of the trial court. Aside from the general rule which precludes one co-defendant who is appealing from complaining of any alleged errors which affect another defendant who is not appealing (17 Cor. Jur. 208), the question of the propriety of the trial court's action in adjudging counsel guilty of contempt, and in keeping the interruptions within legitimate bounds, has been definitely disposed of adversely to appellant's contention in *In re Hallinan,* 126 Cal. App. 121 [14 Pac. (2d) 797]. And in any event, at the conclusion of the arguments, the court instructed the jury to the effect that it should disregard remarks of respective counsel and decide the case "upon the evidence which was presented in court, and upon nothing else". It will be presumed that the jury obeyed such instruction. (*People* v. *Cordero,* 72 Cal. App. 526 [237 Pac. 786].

After reviewing the entire case, including the evidence, it is our conclusion that appellant received a fair trial and was justly convicted. The judgment of conviction and order denying the motion for new trial are therefore affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 3, 1934, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 15, 1934.