[Crim. No. 3479. Second Dist., Div. One. Dec. 1, 1941.]

THE PEOPLE, Respondent, v. HAROLD MARVIN, Appellant.

THE PEOPLE, Respondent, v. LAWRENCE J. LESH, Appellant.

Eugene L. Wolver for Appellants.

Earl Warren, Attorney General, Eugene M. Elson, Deputy Attorney General, John F. Dockweiler, District Attorney, and Jere J. Sullivan and H. L. Arterberry, Deputies District Attorney, for Respondent.

DORAN, J.—Appellants were prosecuted under separate informations charging violations of the Corporate Securities Act and a conspiracy to violate the same and to commit grand theft. With their consent, appellants were jointly tried and now appeal from the respective judgments of conviction severally rendered against them, and from the orders denying appellants' motions for a new trial. The information against appellant Marvin alone contained the count for conspiracy to violate the Corporate Securities Act and to commit grand theft. Appellant Marvin was convicted upon fourteen counts, including that of conspiracy; and appellant Lesh was convicted on three counts. Appellants contend that the evidence adduced at the trial is insufficient to sustain the convictions; that errors of law were committed at the trial, requiring a reversal of the judgments; and that misconduct of the court and the prosecutor prevented the appellants from having a fair and impartial trial.

Evidence adduced at the trial revealed the following. In July or August of 1937 appellant Marvin became the owner of a certain lease on property at Rozel Point, Box Elder County, Utah. Thereafter appellant Marvin negotiated with a Mr. Phil Dunn regarding rights in the said

lease, and on January 1, 1938, entered into a formal agreement with Mr. Dunn, which recited that appellant Marvin was interested in forming "a legal and financial entity" for the purpose of developing the above mentioned lease. The agreement provided that if the property, lease and all matters pertaining thereto were found satisfactory to Mr. Dunn, an "entity" would be formed with a capitalization tentatively agreed upon as $100,000; that 15% of the total should be vested in both appellant Marvin and Dunn "for the mutual and common use of both parties as outlined"; and that any sale of the 15% or any portion thereof should result in the moneys so obtained being used in starting and carrying on a deep test oil well; "and should a plan develop wherein this money be returned from the above purpose it shall then be at the disposal of both parties as they mutually see fit." The remaining 85% was to be divided as follows: 60% to Marvin and his associates, M. R. Yant and Lee Lawhon, the remaining 25% to go to Dunn. In consideration of the premises Dunn agreed to place $5,000 at the disposal of the "entity" to be used by the "entity" for the purpose of developing the lease. Dunn's interest was thereafter increased to 40%. Under date of January 19, 1938, Marvin and Dunn entered into a formal agreement between them, denominated "sublease and trust agreement," which recited Dunn's obligation to expend $5,000 in prospecting upon and developing the lands in question, the said sum to be deposited in a Salt Lake City, Utah, bank to the account of "Phil T. Dunn, Trustee." The agreement provided that Dunn's interest in all net profits was to be 40%, and that of Marvin was to be 60%; and that both parties should have the right to assign any or all of their said respective interests. The agreement also stated that it was made for the purpose of starting the development on the land in question and that it was contemplated that a corporation should be formed to assume the responsibilities of the lessee and trustee. In the agreement Dunn was named as trustee and Marvin as lessee. On January 20, 1938, there was formed a Utah corporation known as the Globe Development Corporation; and sales of the shares of this corporation form the basis of most of the charges in the informations filed against appellants. On August 20, 1938, a permit to sell the shares of this corporation was issued by the Commissioner of Corporations of the State of California, authorizing the issuance of such stock

until August 21, 1939. After the issuance of said stock and as a result of a hearing held thereon, a notice of the suspension of said permit was mailed on February 9, 1939, and a notice of the revocation of said permit was mailed on March 3, 1939. There is some question as to whether appellants received such notices. However, appellants were acquitted of the charges of selling stock without a permit after such notices were sent and before August 21, 1939, and the question of the notices is not material, insofar as the charges here considered are concerned.

L. E. Marchand, one of the witnesses, was an elderly man, age 83, and a friend of Dunn's. He testified that he was acquainted with both appellants Marvin and Lesh and knew one Milfred R. Yant, Marvin's associate. He first met Marvin at the apartment house where Marchand lived in Long Beach, California. This was in January, 1938. Yant was with Marvin at the time and the meeting appears to have been arranged through Dunn, who had previously interested Marchand in the Utah venture. Marchand paid appellant Marvin $1,000 at the time of the meeting, which appears to have been on or about January 19, 1938. At a subsequent meeting in Long Beach between Marvin, Yant and Marchand, Marchand paid Yant $500, and later, about February 23, 1938, he paid Marvin another $1,000. At the time of this last payment Marvin gave Marchand a receipt for $2,500, reciting that the payment was for a 20% interest in Marvin's right and title to maltha production from the lease above mentioned in Box Elder County, Utah. Maltha is a substance apparently similar to asphalt. The receipt also stated: "It is proposed that a corporation is to be formed and that he (Marchand) will hold 20 per cent of same." The receipt was signed by Marvin. Subsequently, Marchand at various times paid various amounts to Marvin at Marvin's instance and request; $40 in payment of the taxes on 20,000 shares of stock of the corporation to be issued to Marchand, $1,000 as a loan to the Globe Development Corporation, $500 apparently for a similar loan, another $1,000 for a like loan, $200 to apply in payment for a Delco plant for lights on the lease. Later, in August, 1940, Yant and Marvin came to see Marchand in Long Beach to ask for money, stating that it was needed to purchase a new boiler, and in response thereto Marchand gave them his 2% interest in certain stock

of a corporation known as Los Angeles Basin Drilling Company, for which Marvin and Yant allowed him $800. and gave him a note executed by Marvin as president of the Globe Development Corporation. The note had not been paid at the time of the trial.

Another witness, Nora S. McCullough, had received 450 shares of Globe Development Corporation stock in 1938, but appellant Marvin was acquitted of the charge as to violation of the Corporate Securities Act relating to this transaction. However, in or about September, 1939, Miss McCullough transferred to Marvin an Iowa farm, of which she was the owner, for the purpose of Marvin's obtaining an increased loan on the farm for her. Marvin obtained an increased loan on the farm and Miss McCullough received 2150 shares of Globe Development Corporation stock for the increased amount of the loan. It should be noted that appellant Lesh appears in the above deal through certain correspondence written to Miss McCullough by him, which showed his connection with and interest in the matter.

About September 20, 1939, Marvin solicited one Mrs. K. Marie Bergez to purchase 500 shares of stock in the above mentioned corporation. She purchased the same with a down payment of $100, the balance to be paid out of dividends. Shortly prior to this purchase Marvin had obtained from Mrs. Bergez the sum of $350 as a loan and had given her his postdated check for $425. This check was never paid. About September 5, 1940, a Mr. Lehr or Lear, whom Mrs. Bergez identified at the trial as Milfred R. Yant, called on her and stated that he desired to purchase her Globe Development stock for $1250. At the time, Mrs. Bergez owned 1,000 shares thereof. Mrs. Bergez told him that she had not received the certificate for the last 500 shares, which she had not fully paid for. "Lear" offered to obtain it for her, stating that it would cost $175 to obtain the same. "Lear" later returned with the stock certificate dated September 20, 1939, for 500 shares. The certificate was signed by Marvin as president, with the purported signature of Lesh as secretary. At this time "Lear" gave Mrs. Bergez a receipt for $178.50, the total amount paid to him on delivery of the certificate for 500 shares above mentioned, and on the bottom of this receipt was the notation, "Must pick up check of H. Marvin for $350." "Lear" also gave Mrs. Bergez a written offer to purchase 1,000 shares of Globe De-

velopment · Corporation stock at $125 per share, signed
"Potts, Potts and Dink, by L. Lear." Mr. Lear never re-
turned.

The witness Mrs. Anna Kuhn testified that she lived with
her daughter, Mrs. Erna M. Swyers, at the time she met ap-
pellant Marvin, about November 10, 1938, and that she pur-
chased from Marvin 300 shares of the Globe Development
Corporation stock, paying therefor 20,214 shares of Ameri-
can Metal stock, which she and her daughter informed
appellant Marvin was worth a penny and a half a share. It
should be noted that the permit issued by the Corporation
Commissioner provided that the stock of the Globe Develop-
ment Corporation was to be sold at par for cash, or for not
less than 25% in cash. Par value of the stock is given as
$1 per share. After that, Mrs. Kuhn and her daughter made
an additional investment, Mrs. Kuhn purchasing 600 shares
at $300 and her daughter 400 shares at $200, being at the
rate of 50¢ a share.

A witness, James Carrier, testified that on or about Jan-
uary 13, 1940, in Los Angeles, California, he had purchased
from Marvin 1,000 shares of Globe Development stock for
$750; and that subsequently, about February 28, 1940, he
had likewise purchased an additional 1,500 shares for $750.
Pursuant to a subsequent deal, the details of which need
not here be set forth, appellant Marvin offered Carrier
20,000 shares of Globe Development stock, which shares were
delivered to Carrier by appellant Lesh in December 1940.

Minnie A. Porter, another witness, testified that she first
met Marvin about December 29, 1939, at which time she pur-
chased from him 500 shares of Globe Development Corpora-
tion stock for $350, giving a check therefor payable to
Marvin. She placed the certificate with Marvin for resale
and on January 18, 1940, Marvin returned and gave her $500.
At that time Marvin said that the stock would sell for more
and wanted Miss Porter to take 2,000 shares, which she did,
paying therefor the $500 above mentioned and a check for
$937.50. Marvin called at Miss Porter's home a number of
times when there was no business transacted. Then on April
25, 1940, Miss Porter exchanged her 2,000 shares of stock for
a half interest in a 1/24th overriding royalty in the Globe
Development Corporation. Marvin held the other half in-
terest in the royalty. In addition to her shares of stock Miss

Porter also paid about $1,875 for the royalty interest. Later, about June 24, 1940, Marvin had a conversation with Miss Porter about a refinery that was to be built on the Globe Development Corporation property. Marvin said money was needed to build this refinery and Miss Porter agreed to advance money on the project. She appears to have advanced $3,000 therefor, for which Marvin gave her a postdated check for $3,000. Marvin told Miss Porter that he was giving her a present of the $3,000 interest in the refinery. At the request of either Lesh or Marvin Miss Porter held the $3,000 check and accepted in lieu thereof a check for $1,000 to be paid immediately and a $2,000 check to be paid later. After two attempts to collect the proceeds of the $1,000 check, Miss Porter received a telegram from Lesh stating that she would get her money. She then took the check to her bank and it was paid. The $2,000 check was never paid.

It was also established that in November, 1939, Marvin sold one A. J. Burley 1,000 shares of stock of the Globe Development Corporation. The persons involved in the above related transactions all appear to have been residents of Los Angeles County, California, at the time, and the various negotiations and sales appear to have been entered into in that county.

In addition to the above, it should be stated that the document which evidenced the title of Miss Porter and Marvin in the 1/24th overriding royalty was executed by Marvin as president and Lesh as secretary of the Globe Development Corporation. In connection with the Burley transaction above mentioned, Mr. Burley received his certificate for the stock enclosed with the following letter on the letterhead of the Globe Development Corporation:

"Box 543, Brigham City, Utah, January 8, 1940.

"A. J. Burley, 335 Raymond Avenue, Glendale, Calif.

"Dear Mr. Burley:

"We are enclosing Certificates No. A83 and A84 for one hundred twenty-five and one thousand shares respectively. We regret the delay in forwarding these certificates which has been due to confusion during the holidays from which we are gradually getting untangled and the fact that I have been out of town.

"Mr. Marvin has requested me to further advise you that he has sold the 500 shares and asks you to endorse the 1,000

share certificate and return. He will then send you a new certificate and the $500.

"We trust that this will meet with your approval and I hope that the delay upon my part has not caused you an inconvenience for which you will not forgive me.

"Very truly yours,

"L. J. Lesh, Secretary-Treasurer."

In December of 1940, Lesh called at Mr. Burley's home and delivered the new stock certificate in exchange for that enclosed in the above quoted letter, and at that time stated that they were going to declare a dividend about the 31st of December. Burley never received such a dividend, though he appears to have received a dividend at an earlier date. Lesh also told Burley that the stock was becoming more valuable all the time and offered to sell Burley 1,000 more shares for $750. It appears that prior to this visit by Lesh, on the same day Burley received over the phone what purported to be a telegraph message from a party in San Francisco offering to purchase Burley's stock for $1.25 a share and inquiring how many shares Burley held. Mr. Burley never received a written telegram confirming the phone message, nor was he ever able to locate such a telegram.

Appellant Marvin contends that the sales of stock in which he was involved were sales of his own stock, not that of the corporation, that the sale of the interest to Marchand was a sale of Dunn's interest in the undertaking and not that of Marvin. Appellant Marvin disputes the sufficiency of the evidence as to any conspiracy and as to any attempt to commit grand theft. Evidence was offered at the trial to show that Marvin had paid cash for shares of the corporate stock. Appellant Lesh contends that there was no evidence to show his implication in the charges of which he was found guilty. All such contentions serve merely to raise questions of fact, all of which appear to have been decided by the jury adversely to appellants.

"The rule, upon an appeal in a criminal case, is that the court must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence and then determine whether or not the guilt of the defendant is deducible therefrom. The question for the court to pass upon is whether there were facts before the jury to justify the inference of guilt." (*People* v. *Hen-*

*nessey*, 201 Cal. 568, 571 [258 Pac. 49].) The summary of the evidence given above alone reveals sufficient facts to sustain the verdicts rendered, without taking into consideration other pertinent evidence adduced at the trial but not here discussed.

In passing, it should be noted that the trend of events in the instant case is in many respects similar to that in *People* v. *Yant,* 26 Cal. App. (2d) 725 [80 Pac. (2d) 506] (June 1938). The defendant in that case was convicted of conspiring to violate the Corporate Securities Act and to commit grand theft, and of violation of the act in question, all concerning certain transactions in connection with oil lands near Newhall, California. It would appear that the Milfred R. Yant, the defendant in that case, was the same Milfred R. Yant concerned with certain of the transactions in the instant case. This is revealed by the testimony of appellant Marvin on cross-examination wherein he admitted that he, Marvin, was a salesman for Yant at Newhall; and that when Yant was released on parole from San Quentin, Marvin drove Yant to Salt Lake City. Marvin also admitted under cross-examination that Yant had been paroled to appellant Lesh for the purpose of working for the Globe Development Corporation.

Regarding the contentions of appellants herein, it is pertinent to quote the following from the decision in the Yant case, affirming Yant's conviction (26 Cal. App. (2d) 736): "It should be and is an established principle of law that the substance and not the mere form of transactions constitutes the proper test for determining their real character. If this were not true, it would be comparatively simple to circumvent by sham the provisions of statutes framed for the protection of the public."

 Appellants contend that it was error to admit evidence of the history of Milfred R. Yant and evidence as to Yant's independent transactions. They object particularly to the introduction of the evidence above referred to, elicited from Marvin under cross-examination; also to having permitted the witness Mrs. Bergez to identify Yant as the man "Lear," who called on her, from a photograph of Yant of the type taken for police records. As to permitting the prosecution to elicit from Marvin the fact that Marvin met Yant at San Quentin, upon Yant's release on parole, and drove Yant to Salt Lake City in order for Yant to work for the Globe Development Corporation, it should be borne in

mind that Yant was named in the information against Marvin as a co-conspirator of Marvin. It was incumbent upon the prosecution, therefore, to establish the connection between Yant and Marvin in order to prove the fact of conspiracy. ''Accordingly, it is competent for the prosecution to prove all the circumstances bearing in any way upon the fact of conspiracy, or upon the acts done in pursuance thereof. This proof may cover a very extensive and varied field of inquiry, and include evidence of collateral facts in which the defendant bore a principal part.'' (8 Cal. Jur. 121.) See *People* v. *Yeager,* 194 Cal. 452 [229 Pac. 40], holding that previous felonious acts on the day in question were admissible in proof of a conspiracy; and *People* v. *Tinnin,* 136 Cal. App. 301 [28 Pac. (2d) 951], wherein it was held that in view of the claim of conspiracy, the trial court did not err in admitting in evidence, for the purpose of showing a close relationship between defendant and a co-defendant, a portion of the transcript of defendant's preliminary examination on a robbery charge, from which it appeared that the co-defendant acted as his attorney, and a portion of the transcript of testimony at another trial, from which it appeared that said co-defendant appeared as an alibi witness for defendant, and a ''ticket of leave'' granted defendant when he was released from prison on parole. A hearing was denied by the Supreme Court in *People* v. *Tinnin, supra.*

 Appellants speak of Yant's ''independent'' transactions; but whether the transactions of Yant brought into evidence were independent transactions or part of a conspiracy was a question of fact for the jury. Evidence of such transactions, therefore, was properly introduced and submitted to the jury.

 As pointed out by respondent, under the circumstances, it does not appear that the prosecution was required to produce a more respectable photograph of Yant. In fact, it is not shown that a more acceptable photograph was available. Appellants cite *People* v. *Covington,* 121 Cal. App. 61 [8 Pac. (2d) 490], in support of their contention in this respect. There the attempt of the prosecutor to have a witness identify the defendant from a ''Rogue's Gallery'' picture was held misconduct, though not prejudicial. The distinction between that situation and the one in the case at bar is clear. There could be no necessity to identify the

defendant in a criminal case from a photograph. The defendant is present in the courtroom. The purpose of the production of such a photograph under such circumstances could only be that of casting an unfavorable light upon the defendant. Appellants have cited no authority holding that identification of any other person may not be made from a photograph such as that produced in the instant case, and no authority to that effect has been found.

In support of their contentions above noted appellants rely strongly upon *People* v. *Gilliland,* 39 Cal. App. (2d) 250 [103 Pac. (2d) 179], a case involving a prosecution for conspiracy to violate and for violation of the Corporate Securities Act, decided by this court in May, 1940. The Gilliland case is in no way applicable to the facts of the case at bar. In *People* v. *Gilliland,* evidence had been improperly admitted of an asserted attempt of a co-defendant to induce a witness to give false testimony; certain other evidence in the nature of hearsay had also been admitted, as well as much other irrelevant testimony. The evidence there admitted could have no possible bearing upon proof of the fact of conspiracy, and was highly improper under any circumstances.

■ Appellants complain that it was error for the trial court to instruct the jury in the language of section 778a of the Penal Code that whenever a person, with intent to commit a crime, does any act within this state in execution or part execution of such intent, which culminates in the commission of a crime, either within or without this state such person is punishable for such crime in this state in the same manner as if the same had been committed entirely within this state. Appellants contend that the instruction misled the jury "since several acts were committed in California, which resulted in the consummation of transactions in Utah." That being the case, appellants by their argument concede the applicability of such an instruction to the facts presented, and the instruction in question was essential to a proper consideration of the facts.

■ Appellants contended that the court erred in instructing the jury that the documents referred to as securities in certain of the overt acts of the count on conspiracy and in the other counts of both informations were securities. A security is defined in the Corporate Securities Act as follows (sec. 2, subd. 7, Act 3814, Deering's General Laws):

"The word 'security' shall include any stock, bond, note, treasury stock, debenture, evidence of indebtedness, certificate of interest or participation, certificate of interest in a profit-sharing agreement, certificate of interest in an oil, gas or mining title or lease, collateral trust certificate, any transferable share, investment contract, or beneficial interest in title to property, profits or earnings, guarantee of a security and any certificate of deposit for a security." There can be no question that the documents, shares and participating interests covered by the above mentioned instruction came within the definition of a security contained in the Corporate Securities Act. It was therefore within the province of the trial court to instruct the jury that the documents referred to constituted securities as a matter of law. (*People* v. *McCalla,* 63 Cal. App. 783 [220 Pac. 436] ; *People* v. *Dutton,* 41 Cal. App. (2d) 866 [107 Pac (2d) 937].) In this connection, appellants complain that the above mentioned instruction as to certain documents being securities omitted "the element of selling or issuing as a necessary requisite to a criminal act." The element of selling or issuing a security plays no part in the statutory definition of a security. As to the necessity of finding that the defendants sold or issued securities in order to find them guilty of violating the Corporate Securities Act, it should be noted that the trial court gave the following instructions:

"It is unlawful for any company or any individual to knowingly sell, offer for sale, or take subscriptions for any security of the company's or of his own issue until such individual or such company shall have first applied for and secured from the Commissioner of Corporations, a permit authorizing such sale or subscription."

"You are instructed that the term 'sale' or 'sell' as used in the Corporate Securities Act shall include every disposition or attempt to dispose of a security or interest in a security for value and shall include a contract of sale and exchange and attempt to sell, an option of sale, a solicitation of a sale, subscription or an offer to sell."

"You are instructed that where a corporate security is delivered to a person who pays therefor no consideration, nor does the person delivering or transferring the same to him or her receive any consideration for such delivery or transfer, such security is not sold or issued for value."

The above quoted instructions, together with other instructions given, indicate that the question of the necessity of selling or issuing securities was fully and fairly covered by the trial court in its instructions to the jury.

The trial court instructed the jury that good faith or advice of counsel affords no immunity to one accused of a violation of the Corporate Securities Act and is not a defense. While appellants concede that such an instruction would be proper upon an issue of whether a permit to issue a security were necessary, and advice of counsel were relied on in this regard (*People* v. *McCalla, supra*), yet it is the contention of appellants that the instant case is one within the rule of *People* v. *Flumerfelt,* 35 Cal. App. (2d) 495 [96 Pac. (2d) 190], and that the situation in the instant case is the same as that in *Russell* v. *Ruffcorn,* 132 Cal. App. 215 [22 Pac. (2d) 597, 23 Pac. (2d) 1014]. *People* v. *Flumerfelt, supra,* was concerned with the factual existence or nonexistence of a permit and advice of counsel as to such existence. Appellants here argue that the instruction complained of was inapplicable principally because of the situation governing the issuance of the 20,000 shares of stock to James Carrier, as alleged in overt act 21 of count I in the information against Marvin. Marvin testified that these 20,000 shares represented 20,000 shares of stock that Marvin put up in escrow in California in accordance with the requirements set forth in the permit of the corporation commissioner. The appellants therefore argue that this particular stock was Marvin's personal stock; and that after the revocation of the permit to sell stock the impounded shares belonging to Marvin were *ipso facto* released from the terms of the escrow and Marvin was thereafter free to sell the same as his own stock, and that he was so advised by a Utah attorney. This argument is based upon the case of *Russell* v. *Ruffcorn, supra,* which appears to have held that personal shares of stock so impounded were released from escrow upon the revocation of a permit to sell corporate securities under which the personal shares were placed in escrow. However, in the case at bar the 20,000 shares in question were sold to Carrier a considerable time after the date for the expiration of the California permit. There can therefore be no question of advice as to the existence or non-existence of a permit, since under the circumstances here presented appellants must have known that the permit to sell shares had in any event expired

at the time they consummated the transaction regarding the said 20,000 shares. *People* v. *Flumerfelt,* therefore, is not applicable. As to *Russell* v. *Ruffcorn, supra,* the court in that case expressly found that the shares of stock there sold were the personal property of the individuals concerned. In the case at bar, however, it would appear from the verdicts returned by the jury that the jury had found otherwise with respect to the shares claimed to have been owned personally by Marvin. Hence the rule in *Russell* v. *Ruffcorn* is also inapplicable; and the instruction here given with respect to advice of counsel would appear properly applicable to the facts of the instant case, in accordance with the rule enunciated in *People* v. *McCalla, supra.*

 Appellants complain of an instruction to the effect that "if, while said permit was in full force and effect, the defendants made any sales of stock contrary to or in violation of the provisions of said permit then and in that event he or they would be guilty of a violation of the Corporate Securities Act the same as if no permit had been granted." Appellants argue that the permit was issued to the corporation and it was not what Marvin received on the sale of the stock but what the corporation received that determined whether or not the permit was violated, and as long as the corporation issued the stock in accordance with the terms given it there was no violation of law. Such argument assumes that the evidence uncontrovertibly showed that the corporation had received par value for the shares issued and that the sales here in question were those of defendants' own personal stock. It has already been pointed out that the jury in arriving at its verdicts presumably found the opposite to be true. In this connection, reference should here be made again to the quotation from *People* v. *Yant* above given. It should also be pointed out that the jury could not have been misled by the instruction here complained of, since the court also instructed the jury that the *bona fide* owner of stock who sells his stock for his personal benefit or who gives away his stock is not subject to the provisions of the Corporate Securities Act, and may sell or give away his stock without the necessity of obtaining a permit from the Commissioner of Corporations.

 Appellants also contend that the court's failure to give certain requested instructions was prejudicial to the

respective appellants. One such instance is the refusal to instruct generally that a security issued contrary to the terms of the permit may be rendered valid by the subsequent ratification of the Commissioner of Corporations. There is no merit to the contention. Even were such a proposition tenable it would not apply to the facts of the instant case. *People* v. *Ferguson,* 134 Cal. App. 41 [24 Pac. (2d) 965], cited by appellants, affords them no support in the matter. Appellants' requested instruction that "after a corporate security has been legally issued, whether the same be pursuant to a permit in a state or states requiring a permit . . . , or without a permit if no permit be required . . . the same becomes personal property, and may be transferred by the owner thereof without the obtaining of a subsequent permit . . . " constitutes a mere repetition in other language of the proposition that the owner of stock may sell or give it away for his own personal benefit without the necessity of obtaining a permit. The jury was amply instructed upon this proposition, as already noted. It is obvious that when a corporate security has been legally issued the same becomes personal property, and any further instruction to that effect would be superfluous. Appellants' requested instruction to the effect that a conspiracy could be terminated was properly refused. As applied to the evidence submitted to the jury, the instruction in the form requested could have served no purpose except that of confusing and misleading the jurors. The evidence presented did not warrant any such instruction as that requested.

Appellants requested an instruction upon the situation as presented in *Russell* v. *Ruffcorn, supra,* discussed above. Such an instruction as that requested could only be applied where the facts showed that stock in escrow was the personal property of an individual. The ownership of the stock here in question was a fact to be determined by the jury, and the jury does not appear to have decided the question in appellants' favor. Under the circumstances, failure to give the requested instruction could not be held prejudicial error, even assuming that the proposed instruction correctly stated the principle of law involved.

Appellants' request that the jury be instructed that it was necessary to find the existence of a conspiracy both to violate the Corporate Securities Act and to commit grand theft in order to find appellant Marvin guilty of the charge

of conspiracy, contained in the first count against him, was properly refused. The proposed instruction went on to state that if the jury found that Marvin had conspired only to violate the Corporate Securities Act or to commit grand theft, Marvin should be found not guilty of the charge. Appellants' contention with regard to the refusal of their requested instruction is fully answered in *People* v. *Yant, supra,* at pages 729 *et seq.*

Appellants complain of the refusal of the court to give a requested instruction to the effect that in regard to the charge of conspiracy certain conversations of and acts of alleged co-conspirators, including letters and instruments written by such co-conspirators were allowed to be introduced into evidence and that the introduction of such conversations or acts must not be considered by the jury in determining whether a conspiracy in fact existed; that before considering such conversations or acts of co-conspirators, the jury must find that the existence of a conspiracy has been proven beyond a reasonable doubt. The substance of this request was covered by an instruction given at the request of defendants, as follows: ''You are instructed that acts and declarations of an alleged co-conspirator made during the period of a conspiracy and in furtherance thereof, are admissible against other co-conspirators only if other evidence warrants the finding beyond a reasonable doubt that a conspiracy actually existed. The acts and declarations of an alleged co-conspirator, however, are not binding upon any other alleged co-conspirator unless and until, independent of such declarations and acts a conspiracy has been shown beyond a reasonable doubt to exist and in no case may such declarations be received as proof of the conspiracy.'' The instruction quoted, together with others given, amply covered the matter contained in the requested instruction and there is no basis for appellants' complaint with respect to the refusal of the court to give the particular instruction requested. Indeed, the instructions given went further than the rule requires, for proof beyond a reasonable doubt, before evidence of the acts and declarations of a co-conspirator may be considered, is not required.

Other requested instructions, refusal of which by the court is cited as error, were either covered in substance by instruc-

198

tions given or failed to state correctly the proposition of law involved.

▮ Appellants' assignment of misconduct on the part of the trial judge is without merit. Such assignment is based largely on remarks of the trial judge made in an apparent attempt to point out that certain testimony being elicited on behalf of the defendants and certain documents sought to be introduced in evidence in their behalf were not necessary. The court does not appear to have overstepped the bounds of its discretion in the remarks made. The record merely reveals an effort on the part of the court to lessen, if possible, the amount of purely cumulative matter, where the same appeared to the court unnecessary to the defense. In one instance, on request by defendants' counsel, the court ordered its remarks stricken. In that instance the court had referred to a certain payment as a dividend. The implications appellants seek to attach to many of the court's remarks are not readily apparent from a reading of the record and would require a strained construction to be placed on the remarks in question. In any event, it cannot be said that the defendants were prejudiced by the court's action in this regard.

▮ As to misconduct on the part of the prosecutor, if some of the conduct and remarks of the prosecutor might be viewed as overzealous, in no instance could it be said to have resulted in prejudice. When the prosecuting attorney spoke of Marvin and Yant as ''dear old pals'' and remarked that it would be more appropriate to refer to them as ''dear old cell mates,'' his reference to cell mates was stricken upon objection.

For the foregoing reasons the judgments and orders are affirmed.

York, P. J., and White, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 29, 1941.