## UNITED STATES v. HILLYARD.

### No. C–3879.

District Court, E. D. Washington, S. D.

Nov. 30, 1943.

Edward M. Connelly, U. S. Atty., of Spokane, Wash., for plaintiff.

A. E. Dailey, of Everett, Wash., for defendant.

SCHWELLENBACH, District Judge.

The defendant, having been duly (28 U.S.C.A. § 412) drawn as a juror, refused to serve giving as his reason his membership in Jehovah's Witnesses. The Witnesses are an unincorporated body whose teaching is that the obligations imposed by God are superior to those enacted by temporal government. Their religious belief includes a literal version of Exodus, Chap. 20, verses 3, 4, and 5, in which it is said: "Thou shalt not have strange gods before me. Thou shalt not make unto thee any graven image, nor any likeness of anything that is in heaven above, or that is in the water under the earth; Thou shalt not bow down Thyself to them, nor serve them: for I the Lord thy God am a jealous God, visiting the ·iniquity of the· fathers upon the children unto the third and fourth generation of them that hate me." While the defendant demonstrated his sincerity by expressing his willingness to submit to whatever punishment the court should impose, I felt that his refusal constituted such a challenge to the authority of the court as to require more formal inquiry and consideration. Consequently, I requested the United States Attorney for this District to prepare the necessary pleadings and issued an order citing the defendant to show cause why he should not be punished for contempt. The use of the contempt procedure in situations such as this is well established. Loubriel v. United States, 2 Cir., 9 F.2d 807; United States v. Dachis, D.C., 36 F.2d 601; 31 Am.Jur. p. 593. The compulsory attendance of jurors is necessary if the requirement of the representative character of a jury (Smith ·v. State of Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84) is to be met.

Defendant justifies his refusal to serve on the basis of that portion of the First Amendment to the Constitution reading: "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof." The use of language of this general character was proposed by Madison, its author, in a letter to Jefferson, dated October 17, 1788, in which he said: "There is great reason to fear that a positive declaration of some of the most essential rights could not be obtained in the requisite latitude. I am sure that the rights of conscience in particular, if submitted to public definition, would be narrowed much more than they are likely ever to be by an assumed power." "Writings of James Madison," Vol. I, p. 424. The issue here is whether the reach of this general language is sufficiently broad to justify defendant in his defiance of the court's order and his refusal to perform the very salutary duty of citizenship and to assist this court in obeying the constitutional mandate of the Seventh Amendment. I must confess an utter inability to comprehend any relationship be-

tween defendant's professed religious beliefs and his distaste for jury service. I am unable to reconcile the Jehovah's Witnesses' abhorrence for human institutions with the alacrity with which they rush into the protecting arms of our courts whenever they become involved in controversy with our civil or military authorities. At the same time, I am aware that it is the recognition of the divergences of thought and difficulties of comprehension in matters involving religion and conscience which requires the approach to a problem such as this by mental processes entirely divorced from the ordinary rules of logic.

I am convinced that in seeking an answer to the question posed here, little or no assistance can be found in the decided cases. The recent line of cases involving the distribution of literature (Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, 146 A.L.R. 82; Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313; Douglas v. Jeannette, 319 U.S. 157, 63 S.Ct. 877, 882, 87 L.Ed. 1324) must be discarded because in them there were involved ordinances purposefully directed at the religious activities of the petitioners. West Virginia State Board of Education v. Barnette et al., 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, is of little assistance because of the emphasis therein placed upon the use of the flag as a symbol. I can find no assistance in the sacramental wine case, Shapiro v. Lyle, D.C., 30 F.2d 971, or the compulsory vaccination case, Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643, 3 Ann.Cas. 765, or in the old polygamy cases, Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637; Mormon Church v. United States, 136 U.S. 1, 10 S.Ct. 792, 34 L.Ed. 481, because in those cases there were involved violations of statutes enacted generally for the purpose of protecting the general welfare in the interests of peace and good order. Hamilton v. Regents, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343, is inapplicable because of the option exercised by students in attending universities supported in part by funds made contingent upon the requiring of compulsory military training. Selective Service cases are of no value because they are based upon the war power which transcends other constitutional limitations. See, Selective Draft Law Cases (Arver v. United States), 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A. 1918C, 361, Ann.Cas.1918B, 856; United States v. Macintosh, 283 U.S. 605, 51 S. Ct. 570, 75 L.Ed. 1302. However, the Supreme Court did point the way, in Reynolds v. United States, 98 U.S. 145, 162, 25 L.Ed. 244, when it said: "The word 're-ligion' is not defined in the Constitution. We must go elsewhere, therefore, to ascertain its meaning, and nowhere more appropriately, we think, than to the history of the times in the midst of which the provision was adopted."

The "history of the times" is filled with instances of bigotry, intolerance, repression and persecution. The Colonists who fled from the old world to escape religious persecution brought with them none of the tolerance towards those with whom they disagreed which they had demanded from those from whom they fled. The statute books of the Colonies were replete with laws by which the majority members of each Colony attempted to enforce upon others the precepts of the particular denomination or faith to which the majority adhered. People were taxed against their will for the support of religion and, sometimes, for the purpose of particular sects to whose tenets they could not and did not subscribe. The voice of Roger Williams was as one crying in the wilderness for religious freedom. It is small wonder that he chose the name of Providence for the harborage in which he found asylum among the Indians. Thomas Jefferson described the attitude of his fellow Virginians as follows: "The first settlers were emigrants from England, of the English Church, just at a point of time when it was flushed with complete victory over the religions of all other persuasions. Possessed, as they became, of the powers of making, administering and executing the laws, they showed equal intolerance in this country with their Presbyterian brethren who had emigrated to the northern government. * * * If no capital executions took place here, as did in New England, it was not owing to the moderation of the church, or spirit of the legislature, as may be inferred from the law itself; but to historical circumstances which have not been handed down to us." Jefferson's "Notes on Virginia," 1788, p. 167. Even the "Act of Toleration" of which Maryland so proudly boasts, provided the death penalty for those who might thrice be convicted of violating the statute defining blasphemy to be to "deny our Saviour to be the Son of God, or deny the Holy Trinity, or the Godhead of any of the three

Persons, or the Unity of the Godhead." Bacon's "Laws of Maryland," Chap. 16, Sec. 1. These differences and dissensions concerning religion finally culminated when there was introduced in the House of Delegates in Virginia "A Bill establishing provisions for Teachers of the Christian Religion." After the introduction of that bill, James Madison prepared and presented to the General Assembly of Virginia his celebrated "Memorial and Remonstrance" in which he said: "The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable; because the opinions of men, depending only on the evidence contemplated by their own minds, cannot follow the dictates of other men: It is unalienable also; because what is here a right towards men, is a duty towards the Creator. *It is the duty of every man to render to the Creator such homage, and such only, as he believes to be acceptable to Him. This duty is precedent, both in order of time and in degree of obligation to the claims of Civil Society. Before any man can be considered as a member of Civil Society, he must be considered as a subject of the Universe. And if a member of Civil Society, who enters into any subordinate association, must always do it with a reservation of his duty to the General Authority; much more must every man who becomes a member of any particular Civil Society, do it with a saving of his allegiance to the Universal Sovereign.* We maintain therefore that in matters of religion, no man's right is abridged by the institution of Civil Society, and that Religion is wholly exempt from its cognizance." Papers of James Madison, Vol. VI, Manuscript Division, Library of Congress. (Emphasis mine). Madison's "Memorial" did more than merely defeat the Henry proposal. As an outgrowth of the discussion concerning it, Jefferson's "Act for the Establishment of Religious Freedom in Virginia" was adopted. 1 Jeff.Works 45. Hening's "Collection of the Laws of Virginia," Vol. XII, p. 84, in which, inter alia, it was provided "That to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on the supposition of their ill tendency, is a dangerous fallacy; which, at once destroys all religious liberty; because he, being of course judge of that tendency, will make his opinions the rule of judgment, and approve or condemn the sentiments of others, only as they shall agree with, or differ with his own,—*That it is time enough for the rightful purposes of civil government, for its officers to interpose when principles break out in overt acts against peace and good order.* And finally, that truth is great, and will prevail if left to herself, that she is the proper and sufficient antagonist to error; and can have nothing to fear from the conflict, unless by human interposition disarmed of her natural weapons, (free argument and debate) errors ceasing to be dangerous, when it is permitted freely to contradict them." (Emphasis mine).

When Mr. Jefferson learned of the omission in the Constitution of any mention of freedom of religion, he expressed his disappointment. 2 Jeff.Works, 355. Five of the states—New York, New Hampshire, Rhode Island, North Carolina, and Virginia—included some form of a declaration of religious freedom in the changes they desired to have made before the Constitution might finally be adopted. See New York, Elliot, "Debates on the Federal Constitution," Vol. I, p. 328; New Hampshire, id. Vol. I, p. 326; Virginia, id. Vol. III, p. 659; North Carolina, id. Vol. IV, p. 242; Rhode Island, id. Vol. I, p. 334. In Pennsylvania, a minority of the Ratifying Convention published in their "Reasons of Dissent" a demand for the recognition that "the right of conscience shall be held inviolable." Carey's "American Museum," Vol. II, No. 5, p. 536. As a consequence, at the first meeting of the new Congress, Mr. Madison proposed the First Amendment which was adopted and ratified. Jefferson construed this amendment as follows: " * * * Religion is a matter which lies solely between man and his God; * * * he owes account to none other for his faith or his worship; * * * the legislative powers of the Government reach actions only, and not opinions,—I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of religion, or prohibiting the free exercise thereof', thus building a wall of separation between church and state." 8 Jeff.Works 113.

The Supreme Court, in Reynolds v. United States, supra, 98 U.S. at page 163, 25 L.Ed. 244, construing the amendment

in conjunction with the Virginia statute, said: "In the preamble of this act (12 Hening's Stat. 84) religious freedom is defined; and after a recital 'that to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill tendency, is a dangerous fallacy which at once destroys all religious liberty,' it is declared 'that it is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts against peace and good order.' *In these two sentences is found the true distinction between what properly belongs to the church and what to the State.*" (Emphasis mine).

Thus reading the amendment in the light of the "history of the times," with the knowledge of the views of the two men most responsible for it, and with the interpretation the Supreme Court has placed on it, I feel constrained to resolve the very considerable doubt in my mind in favor of the defendant. While I cannot understand defendant's reasoning and cannot accept his conclusion, I must admit that his refusal to serve does not amount to a breaking out "into overt acts against peace and good order." I have no fear that the prestige of this court will be diminished by this result. Fortunately, in this country the dignity of a court does not depend on its use of its power. Oftentimes a free government can best demonstrate its strength by frugality in its use. Power need not always beget force. Only those who need rely on power must always use it.

The action will be dismissed.