[No. A021560. First Dist., Div. Two. Oct. 30, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL DELGADO PERVOE, Defendant and Appellant.

344

COUNSEL

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Court of Appeal, David R. Feld, Peter R. Silten and Judith W. Allen, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Eugene W. Kaster and Karl W. Payne, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SMITH, J.—Appellant Michael Delgado Pervoe appeals from a judgment of conviction based upon a jury verdict for first degree murder (Pen. Code, § 187), attempted first degree murder (Pen. Code, §§ 187, 664) and the use of a firearm during the commission of those offenses (Pen. Code, § 12022.5).

BACKGROUND

On the afternoon and evening of December 31, 1981, prosecution witness Mordacai Carr-Kane dealt cards for money on San Pablo Avenue in Oakland. He was helped during the game by a man later identified as appellant, whom Carr-Kane had seen "a couple of times" and had also noticed in a photo album belonging to his girlfriend's sister. Carr-Kane knew appellant was called "Delgado" or "Gargo."

When the card game ended after several liquor runs, Carr-Kane had made $275. He gave $75 of that money to appellant. They were subsequently joined by Carr-Kane's girlfriend, Teri Persons, another woman named "Baby," and a third woman named "Sparkle." Sparkle was later identified as appellant's sister. The group went to San Francisco on Bay Area Rapid Transit (BART), and during the ride Carr-Kane made $175 by selling jewelry.

After a short time in San Francisco, the group decided to take a cab, planning to drive Baby and Sparkle home to Richmond, then drive Teri to Oakland after which appellant and Carr-Kane would go to an Emeryville nightclub. Carr-Kane stated that he sat in the middle-back seat with Sparkle on his left and appellant on his right. Teri sat next to the driver with Baby near the window.

The cab drove to an apartment complex in Richmond at which time appellant, Sparkle, and Baby got out and "just walked away" despite appellant's commitment to pay for the cab ride. After appellant ignored the driver's request for payment, the driver ordered Carr-Kane and Teri out of the cab. The cab drove off. Carr-Kane then told Teri to start walking. He, however, followed the others to an upstairs apartment and attempted to engage appellant "in a verbal confrontation." Carr-Kane did not enter the apartment but rather turned around to catch up with Teri.

Three or four minutes later, Carr-Kane saw appellant and another man trotting towards Teri and himself. Carr-Kane told Teri to go to a nearby laundromat, but she refused. The two men caught up with them. Appellant first asked Carr-Kane why he was making "all this noise" about the cab and then asked for Carr-Kane's money. It appears that appellant had seen Carr-Kane give Teri $375 to take home. Carr-Kane had kept $200.

Telling Teri to run, Carr-Kane separated from her as the two began to run down different sides of the street. Appellant pulled out a gun and shot two or three times at Carr-Kane before going after Teri. Teri meanwhile fell on the sidewalk. As appellant reached her, he bent down and shot her twice in the head. He then started shooting again at Carr-Kane.

Carr-Kane ran into a nearby bar, asking someone to call the police. He was subsequently taken to the hospital for treatment where he told police that there were two photographs of his assailant in Teri's sister's photo album. He did not initially mention that he knew his assailant. Carr-Kane described his assailant to the police as being a black male, approximately 26, 5 feet 5 inches tall and wearing a brown fur coat. The assailant's com-

panion was given as a black male, approximately 27, slim build, 5 feet 8 inches tall and wearing a beige rabbit fur coat.

Carr-Kane was later taken to the Richmond police station, and at approximately 5:45 a.m. on January 1, 1982, he was shown a lineup of six photographs including one of appellant taken two to three years earlier. At first unable to identify any photograph, Carr-Kane subsequently picked out the photo of appellant, stating that he was 70-80 percent certain. Carr-Kane was eventually given the photo album, and he selected two pictures of appellant without hesitation. He was also shown a photo of appellant's sister, Chentel Rene Pervoe, whom Carr-Kane identified as "Sparkle."

About 8 a.m., the same morning, Carr-Kane was driven to the apartment complex. He pointed out the apartment in question. Carr-Kane later called the police on that same morning and informed them that he believed appellant's companion was Maurice Jordan. He made a tentative identification of Jordan. However, later in January, Carr-Kane saw the "second man" on two different occasions while in or near the Richmond courthouse complex. On the second occasion, Carr-Kane was with the deceased victim's brother who informed Carr-Kane that the man was "Mac Toris" Pervoe, appellant's brother. However, Carr-Kane was unable to identify the man in a subsequent photo lineup that included the brother's photograph.

Appellant was charged with murder (Pen. Code, § 187) with an allegation of a firearm use (Pen. Code, § 12022.5) and with attempted murder (Pen. Code, §§ 187, 664) enhanced by allegations of firearm use and great bodily injury (Pen. Code, §§ 12022.5, 12022.8). He pled not guilty. Appellant's subsequent motions challenging the compilation of the jury pool and admissibility of certain identifications were denied.

At trial, the prosecution presented, in addition to the above evidence, the testimony of Yellow Cab driver Russell Brown, Jr., who stated that sometime after 1 a.m. on January 1, 1982, two men and three women entered his cab in San Francisco and directed him to drive to Oakland. One of the men was wearing a brown fur coat. After arriving in Oakland, Brown drove onto Highway 80 where he continued until he reached an apartment complex in Richmond. As one man and two women left the cab, that man refused to pay the fare. When Brown asked the other man sitting in the cab's back seat to pay, the fellow said he did not have any money. After ordering that second man and the third woman to leave the cab, Brown saw them walking toward Potrero Avenue. Brown left, but while he was on the freeway, he heard an emergency broadcast that the Richmond police were looking for him. He contacted the police approximately twenty minutes after he had dropped off the five people.

On January 4, 1982, Brown was shown a photo lineup of 12 to 18 male photos. He picked out appellant's photo, stating that he was "certain" that that man was the one wearing a brown fur coat in the cab. Brown, however, was unable to identify appellant in court. Brown was also shown a picture of appellant's sister. He identified her as one of the three women.

BART Police Officer Milton Ng testified that he found Teri Persons lying on the street at about 2:53 a.m. on January 1, 1982. He unsuccessfully attempted to revive her. Her purse was nearby and open. The police did not find any money in it. An autopsy revealed three bullet wounds to her head, two of which were caused by the same bullet. The skin surrounding one wound indicated a close-range gunshot wound.

The physician examining Carr-Kane on January 1, 1982, testified that he had two gunshot wounds, one in his hip and the other in his neck. A test for gunshot residue was performed on Carr-Kane's hands at 4:45 a.m. on January 1, 1982. The results did not reveal any particles appearing to be of gunshot residue origins.

A criminalist testified that the bullets taken from the two victims were .22 caliber with similar grooves and markings. However, the bullet taken from Persons' body was too damaged to conclude positively that the bullets were from the same gun.

Persons' brother, Darrell McCornell, testified that he was with Carr-Kane when Carr-Kane spotted the assailant's companion the second time in the Richmond courthouse complex. McCornell told Carr-Kane that the man was "Gargo's brother, McToris." Carr-Kane then told McCornell that that was the man with appellant when his sister was killed.

A tape-recorded interview by appellant on January 1, 1982, was played at trial. Appellant denied involvement in the shootings, stating that he had been with a girl named "Lynne" that evening. Lynne was never located.

During trial, the court excused a juror for good cause, and an alternate juror was seated. Subsequently, the jury found appellant guilty of first de-gree murder, attempted first degree murder, and the use of a firearm during the commission of those offenses. Appellant was later sentenced to state prison for consecutive terms totalling 33⅓ years to life.

## APPEAL

Appellant raises five issues on appeal: (1) whether he was denied his right to a fair cross-section of the community for a jury; (2) whether the trial

court abused its discretion in excusing a juror who was allegedly the only black member on the jury; (3) whether the trial court improperly refused to suppress appellant's identification by prosecution witness Carr-Kane; (4) whether the trial court erred in failing to suppress identifications of appellant's sister by witnesses Carr-Kane and Brown; and (5) whether the court improperly admitted hearsay testimony concerning Carr-Kane's identification of the assailant's companion.

I

Appellant first contends that the jury selection procedures, utilized in Contra Costa County at the time of his trial, denied his right to an impartial jury composed of a fair cross-section of the community in that it systematically excluded an identifiable group, specifically blacks. We disagree.

Both the Sixth Amendment of the federal Constitution and article I, section 16, of the California Constitution guarantee a criminal defendant's right to trial by an impartial jury drawn from a representative cross-section of the community. (*Taylor* v. *Louisiana* (1975) 419 U.S. 522, 530 [42 L.Ed.2d 690, 698, 95 S.Ct. 692]; *People* v. *Wheeler* (1978) 22 Cal.3d 258, 272 [148 Cal.Rptr. 890, 583 P.2d 748].) To establish a prima facie violation of the fair cross-section requirement, "the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 587, 99 S.Ct. 664].) If a prima facie violation is demonstrated, it can be overcome only by a showing that "a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." (*Id.,* at pp. 367-368 [58 L.Ed.2d at p. 589].)

In *Duren* v. *Missouri, supra,* 439 U.S. 357, the court found that the fair cross-section requirements were not met due to an underrepresentation of women on jury venires in the forum county. Noting that women are a distinct group, thus meeting the first requirement of the three-prong test, the court found that the second prong was satisfied where evidence showed that only 15 percent of jury venires were women despite the fact that women compose 53 percent of the population eligible for service. (*Id.,* at pp. 364-367 [58 L.Ed.2d at pp. 586-588].) In discussing the requirements of the third prong of "systematic exclusion" and the defendant's statistical showing the court stated that an "undisputed demonstration that a large discrepancy occurred not just occasionally, but in every weekly venire for . . . a

year manifestly indicates that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized." (*Id.*, at pp. 366-367 [58 L.Ed.2d at p. 588].)

We note, however, that the "systematic exclusion" prong was equally supported by evidence establishing when the exclusionary actions took place during the selection process. In *Duren,* the first indication of systematic discrepancy was at the construction of the jury wheel from which individuals were randomly summoned for service. The forum county provided an improper automatic exemption to any woman upon request during this summons stage. The Supreme Court stated: "Less than 30 percent of those summoned were female, demonstrating that a substantially larger number of women answering the questionnaire claimed either ineligibility or exemption from jury service. Moreover, at the summons stage women were not only given another opportunity to claim exemption, but also were presumed to have claimed exemption when they did not respond to the summons. Thus, the percentage of women at the final venire stage (14.5%) was much lower that the percentage of women who were summoned for service (26.7%)." (*Duren* v. *Missouri, supra,* 439 U.S. 357 at pp. 366-367 [58 L.Ed.2d 579 at p. 588].)

The court in *Duren* reasoned that "[t]he resulting disproportionate and consistent exclusion of women from the jury wheel and at the venire stage was quite obviously due to the *system* by which juries were selected. Petitioner demonstrated that the underrepresentation of women in the final pool of prospective jurors was due to the operation of Missouri's exemption criteria ; . . implemented in Jackson County. Women were therefore systematically underrepresented . . . ." (*Id.,* at p. 367 [58 L.Ed.2d at p. 588].) Therefore, the *Duren* court relied upon both the statistical showings and the jury system analysis of the defendant to find satisfaction of "systematic exclusion" prong.

The *Duren* rule was first applied to the procedures used in Contra Costa County in *People* v. *Buford* (1982) 132 Cal.App.3d 288 [182 Cal.Rptr. 904], where Division One of the First Appellate District found that the defendant had established a prima facie case of systematic exclusion of blacks from the jury process. The court initially outlined statistical evidence that during the period of the defendant's trial in late 1979, there were two jury panels in which there were no black members and there was one jury panel with only one black member. There was also evidence that a venire during this same period included only six to ten blacks, based on the visual observation of the jury commissioner who also testified that this representation of blacks was average for jury pools during this period. (*Id.,* at

pp. 290-292.)[1] The *Buford* court concluded that this evidence established a "marked discrepancy" between the percentage of adult blacks in the county (7.3 percent) and the percentage appearing on the various jury groups (0 to 3.7 percent). (*Id.*, at pp. 295-296, 299.)[2]

Noting that the statistical evidence was not perfect, the court acknowledged that a defendant should not be required to exclude all possible and permissible explanations for the underrepresentation but that, in any event, the *"appellant's case [did] not rest upon statistics alone,* he has presented evidence suggesting a plausible systematic explanation for some degree of disparity,* " e.g., the county's informal excuse procedures. (*People* v. *Buford, supra,* 132 Cal.App.3d at p. 298; italics added.) At that time, 40 percent of all prospective jurors were either excused or deferred. Less than 5 percent submitted written verification of their asserted reasons, and 80 percent of all excuses and deferments were granted by the commissioner's staff over the telephone without written guidelines. The court particularly noted that a deferment for financial burden was improperly granted if the party would lose a day's pay which could not be adequately reimbursed by jury fees. (*Id.*, at pp. 297-298.)

In the instant case, appellant has presented statistical evidence that during the five weeks prior to the hearing on his *Buford* motion, there was an average of 3.76 percent of blacks in the weekly jury pools, and that there was 8.1 percent of eligible black adults in the county population.[3] Calling the county's jury commissioner to testify, defendant also presented the methods used by the county in developing its jury pools. Initially, a master list of approximately 55,000 names is drawn twice yearly from a combi-

---

[1]In *Buford,* the master jury panel list for potential jurors was drawn from both voter registration lists and Department of Motor Vehicles (DMV) records. (*People* v. *Buford, supra,* 132 Cal.App.3d at p. 291.)

[2]The low figure of "0" is drawn from the samples of jury panels. The high figure of "3.7" is drawn from the jury venire example. Thus, the *Buford* opinion seemingly mixed these different types of sample groups to arrive at a figure of "0 to 3.7 percent."

[3]The weekly statistics are as follows:
October 18—177 people, 6 blacks (3.3 percent).
October 25—168 people, 6 blacks (3.5 percent).
November 1—184 people, 7 blacks (3.7 percent).
November 8—123 people, 6 blacks (4.8 percent).
November 15—170 people, 6 blacks (3.5 percent).
The figures for the two weeks following the *Buford* hearing and preceding appellant's trial were as follows:
November 22—121 people, 3 blacks (2.4 percent).
November 29—133 people, 5 blacks (3.7 percent).
We also note that the California Supreme Court has recently upheld the use of "total population figures" as the comparison base for showing underrepresentation. Thus, a narrower jury eligible group figure is not necessary. (*People* v. *Harris* (1984) 36 Cal.3d 36, 53-54 [201 Cal.Rptr. 782, 679 P.2d 433].)

nation of voter registration lists and DMV lists. Affidavits are then sent to these potential jurors. In the qualification period prior to appellant's trial, 47,603 affidavits were mailed, of which 12,406 (26 percent) resulted in no response and 28,044 (59 percent) became qualified adults. Members of this qualified list are then sent a summons to appear for jury duty. In October 1982, for example, the commissioner mailed 1,700 summons. Of that number, 157 (9 percent) failed to appear, and 548 (32 percent) were either excused or deferred.

Also subsequent to the *Buford* decision, the commissioner instituted new procedures. Excuses were only granted by written request. Medical excuses had to be verified. Deferments were still granted over the phone by commission staff without guidelines, but the commissioner cautioned that only one deferment could be granted to a juror and that the deferment simply meant that the juror would be called back within 90 days. Also, two weeks prior to appellant's hearing, the commissioner had instituted a followup procedure sending a second summons to qualified jurors who failed to appear for jury duty.

The trial court denied appellant's motion, finding no "systematic exclusion of any identifiable segment of the community." Contesting this ruling, appellant asserts that the above evidence is indistinguishable from that presented in *People* v. *Buford, supra,* 132 Cal.App.3d 288, and that the county's procedures for excusing or deferring qualified jurors are as informal and subjective as in *Buford*. He, therefore, argues that the court erred by failing to require the prosecution to justify the alleged disparities.

We disagree. Appellant's statistical evidence alone does not establish an ongoing "large discrepancy" (see *Duren* v. *Missouri, supra,* 439 U.S. 357, 366-367 [58 L.Ed.2d 579 at p. 588]) to support a finding of systematic exclusion. The statistical disparity in *Duren* showed that the identifiable group composed 53 percent of the population but only 15 percent of the jury venires for a one year period. (*Ibid.*) In contrast, the statistics in the present case establish a small disparity of 8.1 in the eligible adult population and an average of 3.76 in jury pools over a five-week period. The instant facts represent a 50 percent smaller disparity than existed in *Duren*.

We also find appellant's situation to be distinguishable from *People* v. *Buford, supra,* 132 Cal.App.3d 288. In *Buford*, 7.3 percent of the identifiable group were found in the adult population but only 0 to 3.7 percent in jury panels and venire. (*Id.,* at pp. 295-296.) The 0 to 3.7 percent range in *Buford* is substantially lower than the range of 2.4 to 4.8 percent present in the instant case. Division One of the First Appellate District decided *Buford*

and has since decided two cases, *People* v. *Black* (1984) 160 Cal.App.3d 480 [206 Cal.Rptr. 744], petition for hearing pending and *People* v. *Jones* (1984) 151 Cal.App.3d 1029 [199 Cal.Rptr. 185], which dealt with the same question of systematic exclusion arising out of the same county.[4] In *Jones* about 4.2 percent and in *Black* between 2.2 and 3.56 percent of the persons called for jury duty were black. In each case, after also discussing evidence of county jury procedures introduced at trial, this same court found that Contra Costa County, employing the same procedures being considered here, was " 'doing all that can reasonably be expected to achieve the constitutional goal.' " (*People* v. *Jones, supra,* 151 Cal.App.3d at p. 1033, quoting *People* v. *Buford, supra,* 132 Cal.App.3d at pp. 298-299.)[5]

All of the courts, from *Duren* through *Buford, Jones* and *Black,* have looked both at statistical disparity and jury selection procedures to determine whether the systematic exclusion prong has been met. The *Buford* court not only found a "marked discrepancy" in statistics but also rested their decision on a "systematic explanation for some degree of disparity" based upon the county's informal excuse procedures. (*People* v. *Buford, supra,* 132 Cal.App.3d at p. 298.)

Appellant mentions that in *Buford,* at page 296, Justice Grodin notes that *Duren* "strongly suggests that in a proper case the . . . third prong[] of the prima facie case can be satisfied by statistics alone."[6] There may be a "proper case" where the disparity is overwhelming and statistics alone will be sufficient. However, where, as in this case, the statistics do not reveal an overwhelming discrepancy, the defendant is compelled to offer evidence of what he alleges to be the shortcoming of the jury selection process or system in an effort to satisfy the third prong of his prima facie case. De-

[4]In *People* v. *Gaines*█ (Cal.App.), Division One of this district restated that *Buford* did not hold unconstitutional the system of jury excusals and deferrals practiced in Contra Costa County. Under this same system, 10 percent of those called for empanelment on the *Gaines* jury were black.

[5]In *People* v. *Jones, supra,* 151 Cal.App.3d at page 1033, Division One of this district held that these changes in selection procedure as well as other process methods constitute sufficient rebuttal evidence to overcome a prima facie case of systematic exclusion.

[6]At oral argument, appellant seemingly suggested that *Rabinowitz* v. *United States* (5th Cir. 1966) 366 F.2d 34—a case which was decided 13 years prior to *Duren*—supported the proposition that systematic exclusion was determined by statistical disparity alone. In *Rabinowitz,* however, the statistics again showed a large disparity. There were 34.55 percent blacks in the adult population but only 5.8 percent on the jury master list. (*Id.,* at p. 39.) Furthermore, the *Rabinowitz* court found procedural error in that the methods used in developing these master lists improperly applied the standards set by Congress for federal courts under 28 United States Code section 1861 as amended by the Civil Rights Act of 1957. (*Id.,* at pp. 50-51.) The court thus relied on both a large statistical disparity and evidence of improper selection procedures.

fendant did introduce evidence of the Contra Costa County jury selection process. This evidence, instead of showing systematic exclusion, demonstrated that the county was "doing all that can reasonably be expected to achieve the constitutional goal." (See *People* v. *Buford, supra,* 132 Cal.App.3d 288, 298-299.)[7]

We are reminded that " 'every jury [need not] contain [representatives] of all the economic, social, religious, racial, political and geographic groups of the community . . . .' " (*People* v. *Harris, supra,* 36 Cal.3d 36, 49, quoting *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217, 220 [90 L.Ed. 1181, 1185, 66 S.Ct. 984, 166 A.L.R. 1412].) The fair cross-section requirement only requires "as near an approximation of the ideal cross-section of the community as the process of random draw permits." (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 277.)

In light of the narrowness of the statistical disparity and also appellant's failure to produce evidence establishing an improper jury selection procedure, the trial court reasonably concluded that there was no systematic exclusion in the present case.

## II

Appellant next contends that the trial court erred in excusing a juror during trial.

Trial began on November 29, 1982, but on December 6, 1982, after one week of trial, the court announced that juror No. 3, Mrs. Robinson, was ill. The court stated, "She has arthritis, and she can't raise her left arm. She can't get dressed, and she can't drive a car, so rather than select an

---

[7]The dissent suggests that Contra Costa County should have resorted to the Code of Civil Procedure, sections 204.3, subdivision (b), 225 and 238 to effect the summons, resummons, compelled attendance and fining of those prospective jurors failing to respond to contact by the jury commissioner. Since 26 percent of those sent the questionnaire failed to respond and 9 percent of those summoned failed to appear, this suggested procedure would clearly be extensive. Practically, we question whether a large number of jurors assembled in such a manner would be receptive to cooperative and constructive participation in the jury system. More importantly, we feel that steps presently being taken by the county are those which can "reasonably" be expected.

Also, the dissent would have the county resort to harsh, expensive and extraordinary methods like fines and imprisonment to compel jury participation when there is no reason to believe that those methods would cure or even improve the statistical disparity. We may safely assume that more severe methods would produce increased attendance across the entire spectrum of the venire, but what indication is there—either in the record or in logic—that a particular underrepresented component of the venire would respond in proportionately greater numbers than the rest? We say none, and accordingly must conclude that there is no causal connection between the statistical disparity in this case and the court's failure to undertake more severe measures.

alternate immediately, because she is interested in finished [*sic*] the trial, we will go over until tomorrow. If she cannot come in tomorrow, then we'll select one of the alternates to sit in; and that's the request of the defense, and the People are satisfied with that, also."

On December 7, 1982, the juror again called in sick informing the court through the court reporter that she was unable to come because "she had taken medication. She was sick to her stomach and felt faint from taking the medication . . . she advises this office . . . that she thought she probably could get here tomorrow, because then her husband would be off, and he could drive her." The court concluded, "After reviewing the matter, it would appear to me that there is good cause for excusing Mrs. Robinson . . . ." Appellant at this point refused to stipulate that the juror may be excused and an alternate drawn, noting "that the one person who ended up getting ill is the black woman on the jury." The court then found that the juror was unable to attend trial, "and there is a great deal of doubt in the Court's mind, because she won't even be able to drive tomorrow, that she could get here tomorrow. Therefore, I find good cause for excusing Mrs. Robinson, and we will draw one of the alternates to serve."

Appellant contends that the trial court improperly excused juror No. 3 because her inability to perform the functions of a juror did not "appear in the record as a demonstrable reality." (See *People* v. *Compton* (1971) 6 Cal.3d 55, 60 [98 Cal.Rptr. 217, 490 P.2d 537].) He asserts that the juror did not suffer a severe debilitating condition preventing jury participation, and in light of the *Buford* issue regarding underrepresentation of blacks on jury panels, should not have been excused.[8]

This contention lacks merit. Penal Code section 1123 provides that "[i]f before the jury has returned its verdict into court, a juror becomes sick or upon other good cause shown to the court is found to be unable to perform his duty, the court may order him to be discharged . . ." and draw the name of an alternate. Similarly, Penal Code section 1089 provides that "[i]f at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty . . . the court may order him to be discharged and draw the name of an alternate . . . ."

The decision to discharge a juror and substitute an alternate rests within the discretion of the trial court. (*People* v. *Abbott* (1956) 47 Cal.2d 362,

---

[8]The only reference to the racial composition of appellant's jury was his trial counsel's comment in arguing against the excusal of the juror that that juror was "the black woman on the jury." The record does not establish that that juror was the only black juror on the panel.

371 [303 P.2d 730]; *People* v. *Hall* (1979) 95 Cal.App.3d 299, 307 [157 Cal.Rptr. 107].) If there is any substantial evidence supporting that decision, it will be upheld on appeal. (*People* v. *Farris* (1977) 66 Cal.App.3d 376, 386 [136 Cal.Rptr. 45]; *People* v. *Manriquez* (1976) 59 Cal.App.3d 426, 431-432 [130 Cal.Rptr. 585].)[9] However, the facts demonstrating the inability to perform the functions of a juror must appear in the record as a demonstrable reality. (*People* v. *Compton, supra,* 6 Cal.3d 55, 60.)

Here, there are ample facts to support the lower court's determination that juror No. 3 was ill and unable to perform the duties of a juror. She had arthritis. She couldn't get dressed. She couldn't drive a car. On the second day of her absence, she suffered side effects from her medication. Although she informed the court that she might have transportation to attend trial on December 8, that information was doubted. Moreover, it can be inferred that her arthritis condition, which had not improved over two days, would still prevent her trial attendance on December 8. Clearly, a person suffering from arthritis to such extent as being unable to dress or who suffers medication side effects has a sufficiently debilitating condition which may excuse her from jury duty. (See *People* v. *Hess* (1951) 104 Cal.App.2d 642 [234 P.2d 65] [juror excused after father suffered a stroke]; *People* v. *Tinnin* (1934) 136 Cal.App. 301 [28 P.2d 951] [juror excused after severe attack of hysterics or spells].)[10]

### III

Appellant's third contention is that the trial court erred by failing to suppress the identification of appellant by prosecution witness Mordacai Carr-Kane as the product of an impermissibly suggestive police procedure.

---

[9]A recent opinion issued by an appellate court in the Fourth District questions whether the appropriate standard of appellate review when a juror is excused for good cause should be an " 'independent appellate issue . . . based upon the whole record' " and not merely a substantial evidence analysis. (See *People* v. *Diaz* (1984) 152 Cal.App.3d 926, 933-934 [200 Cal.Rptr. 77].) We need not address this question as it pertains to the excusal of a juror for illness because, under either standard, the trial court's action in the present case was clearly without error.

[10]Appellant's reliance on *People* v. *Lanigan* (1943) 22 Cal.2d 569 [140 Cal.Rptr. 24, 140 A.L.R. 176], and *People* v. *Van Houten* (1980) 113 Cal.App.3d 280 [170 Cal.Rptr. 189], is misplaced. The latter case is distinguishable because, there, the juror was not excused due to illness but rather due to "good cause shown," a separate reason under both Penal Code sections 1089 and 1123. Regarding the former case, we do not find *Lanigan* as supporting appellant's arguments. In that case, a juror was properly excused after several *hours* of discomfort from an intestinal disorder possibly caused by the nervous strain of her court duties, and an examining physician could give no definite assurance as to when the juror would recover. (*People* v. *Lanigan, supra,* 22 Cal.2d at p. 577.) Here, the juror was clearly ill for two *days,* and it could reasonably be assumed that her illness would continue. *Lanigan* actually supports our decision.

In the early morning hours of January 1, 1982, during treatment at the hospital for his gunshot wounds, Carr-Kane informed the police that there were pictures of his assailant in his girlfriend's sister's photobook.[11] Subsequently, however, Carr-Kane was taken to the police station where he was shown six photographs taped in a folder with names covered. One photograph was a 1979 picture of appellant with straight, processed hair. The other photos were of men with similar features and hairstyle. Prior to the lineup, appellant was given a standard photo admonishment.[12]

Carr-Kane first commented that his assailant was "none of these guys here." He then asked if he could see the photographs in the girlfriend's sister's scrapbook. The officers, however, did not give these photographs to him, and Carr-Kane subsequently stated, "It looks like no. 3." Number 3 was appellant's photograph. Carr-Kane stated that the hairstyle was different, but he was as positive as could be without seeing the scrapbook.

Carr-Kane was later given the scrapbook.[13] Upon looking through it, he picked out two photographs of appellant, telling the officers that "that's the guy that shot me and Teri." It was also stipulated that Carr-Kane saw appellant in person at his bail reduction hearing as well as other pretrial court appearances.

Appellant contends that the identification through the girlfriend's sister's scrapbook amounted to an illegal single person lineup. He asserts that those scrapbook photographs should have been mixed with other similar photographs. Otherwise, he argues, the procedure was unduly suggestive, and the "identification" of appellant should have been suppressed.

Although it is not clear which "identification" appellant contends should have been suppressed (e.g., the six-photo lineup, the scrapbook lineup, or the in-court identification), we nevertheless conclude that the scrapbook identification process was not unduly suggestive.

---

[11]These facts are drawn from the hearing on appellant's motion which took place on November 17, 30 and December 1, 1982. There was also a tape recording of the entire identification process on January 1, 1982, which was admitted into evidence.

[12]The admonishment given was "to keep in mind that hair styles, facial hair, and clothing may have changed. That the person or persons you are being asked to identify may or may not be among the photographs. That it is just as important to free innocent persons from suspicion as it is to identify guilty parties. Admonished not to handle the photographs in any manner."

[13]Appellant cites Carr-Kane's testimony at the preliminary hearing that he was unsure of the timing of the scrapbook identifications. However, the trial court found that the scrapbook procedure took place after the six photo lineup. This finding is supported by substantial evidence based upon the officer's and Carr-Kane's testimonies at the hearing.

■ A violation of due process only occurs if a pretrial identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967]; *Stovall* v. *Denno* (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]; *People* v. *Blair* (1979) 25 Cal.3d 640, 659 [159 Cal.Rptr. 818, 602 P.2d 738].) "Whether due process has been violated depends upon the 'totality of the circumstances' surrounding the confrontation." (*Ibid.*; *People* v. *Burke* (1980) 102 Cal.App.3d 932, 940 [163 Cal.Rptr. 4].) It has been held that "[a] procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police." (*People* v. *Slutts* (1968) 259 Cal.App.2d 886, 891 [66 Cal.Rptr. 862].)

■ Here, the victim, Carr-Kane, had ample opportunity during the attack to view his assailant. He identified the assailant as being appellant *prior* to the scrapbook identification. During the scrapbook identification, he was not simply shown two photographs of appellant but was given the book which contained many photos from which he chose appellant's pictures. Under these circumstances, there is no likelihood of an erroneous identification.

*In re Hall* (1981) 30 Cal.3d 408, 432 [179 Cal.Rptr. 223, 637 P.2d 690], and *People* v. *Nation* (1980) 26 Cal.3d 169, 180 [161 Cal.Rptr. 299, 604 P.2d 1051], which appellant relies upon are distinguishable from the present case.

## IV

Appellant contends that the photographic identification of his sister, Chentel Rene Pervoe, by prosecution witnesses Carr-Kane and Brown were the results of illegal single person photo lineups and should have been suppressed.

On January 4, 1982, Richmond Police Officer Simon showed a single photograph to Carr-Kane. Carr-Kane identified the female in the photograph as Chentel Rene Pervoe, appellant's sister. Similarly, Officer Simon showed the sister's photograph to cab driver Brown and asked if he could identify her. Brown stated that that was the woman who sat next to him during the cab drive from San Francisco to Richmond. Appellant asserts that these single photo identifications are clearly erroneous, as the police had time to prepare a fair and neutral lineup.

■ Appellant, however, has not established standing by which he may contest an alleged violation of his sister's due process rights. In the lower

court, his trial counsel cited *People* v. *Bisogni* (1971) 4 Cal.3d 582 [94 Cal.Rptr. 164, 483 P.2d 780], which provides that a defendant has standing to seek to suppress an unfair and suggestive police showup identification of a "coparticipant" in a crime when that identification somehow relates to the identity of the defendant on trial. (*Id.,* at p. 586.) We agree with the trial court's conclusion that *Bisogni* is distinguishable from the present case. Here, appellant's sister was not a coparticipant in the crime. The assailant and his companion were described as being two black males in their mid-twenties. Appellant's sister was merely identified as a member of the party in the cab ride from San Francisco to Richmond.

In any event, assuming that appellant has standing to raise this claim, the argument is without merit. Although an in-person showup of a defendant to a witness for identification purposes has been widely condemned (see *Stovall* v. *Denno, supra,* 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206]; *Foster* v. *California* (1969) 394 U.S. 440, 443 [22 L.Ed.2d 402, 406-407, 89 S.Ct. 1127]), there is case law which has upheld a single photo identification procedure. (See *People* v. *Greene* (1973) 34 Cal.App.3d 622, 646-647 [110 Cal.Rptr. 160].) The pertinent question is whether, under the totality of the circumstances, the procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. (*Ibid.*)

Here, both Carr-Kane and Brown had sufficient opportunity to view appellant's sister during the lengthy cab ride. The officer presenting the photo did not make suggestive comments but merely asked if that person looked familiar. The photo identifications were not unduly suggestive nor did they affect independent observations made of the sister during the evening prior to the shooting.

## V

Appellant lastly contends that the trial court erred by admitting hearsay testimony by Darrell McCornell, the deceased victim's brother.

Prosecution witness Carr-Kane testified on direct that while he was in the Richmond courthouse complex with McCornell, he saw the man who was with appellant at the time of the shootings. Carr-Kane pointed this man out to McCornell. McCornell told Carr-Kane that that was appellant's brother, "McToris" Pervoe.

On cross-examination, defense counsel attempted to impeach these statements, initially by asking appellant whether he had identified the man as "Altoris" Pervoe to Detective Simon after appellant's bail-reduction hear-

ing. He was also asked if he hadn't discovered the brother's name through a police lineup. Carr-Kane's preliminary hearing testimony was then admitted. In that testimony, Carr-Kane stated that he had learned appellant's brother's name through a lineup procedure.

The prosecution subsequently called McCornell who testified that he was with Carr-Kane when Carr-Kane spotted someone and asked him if he knew that person. McCornell replied that, "That's Gargo's brother, McToris." Carr-Kane said that that was the person with appellant when his sister was killed. McCornell later identified "Gargo" as being appellant.

Appellant contends that McCornell's testimony regarding the two statements that the man was appellant's brother, "McToris" Pervoe, and that this man was the assailant's companion were inadmissible hearsay and could not be admitted under the hearsay exception of "prior identification."[14] Respondent initially contends that the statements do not constitute hearsay, particularly in light of the fact that both declarants, Carr-Kane and McCornell, were available at trial for cross-examination, and thus, the policy under the hearsay rule was not violated.

■ We need not reach respondent's argument, for assuming arguendo that the statements were hearsay, they were admissible as prior consistent statements under Evidence Code sections 791 and 1236.

Evidence Code section 1236 provides that evidence of a statement "previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791." Section 791 provides that "[e]vidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement . . . ."

Here, Carr-Kane's testimony regarding his conversation with McCornell and the method of discovery of the companion's name was impeached by

---

[14]The prosecutor initially contended that the statements were admissible as "prior identifications." Yet, at that point in the discussions, counsel approached the bench for an unrecorded conference after which the prosecutor without comment was allowed to continue questioning McCornell. The court did not state its grounds for admitting the alleged hearsay statements. We, however, need not second-guess whether the trial court based its decision on the "prior identifications" theory because a sound legal basis exists to support its conclusion. (*People* v. *Evans* (1967) 249 Cal.App.2d 254, 257 [57 Cal.Rptr. 276]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 226-229, pp. 4215-4220.)

defense counsel through admission of Carr-Kane's preliminary hearing testimony that he learned the companion's name through a police lineup. McCornell's testimony, *subsequent* to this impeachment, consisted of Carr-Kane's statements made prior to the preliminary hearing testimony and were consistent with Carr-Kane's trial testimony.

The judgment is affirmed.

Rouse, J., concurred.

**KLINE, P. J.**—I respectfully dissent.

The conclusion of the majority that defendant has failed to show a systematic exclusion of blacks from jury pools at the time of his trial (maj. opn. at p. 354) seems to be based upon two grounds: (1) "the narrowness of the statistical disparity," and (2) the county's implementation of new jury selection procedures subsequent to the decision in *Buford.* (*Ibid.*) I disagree with the majority's conclusion because I believe the grounds upon which it rests do not genuinely exist. Moreover, by overstating the burden on defendant the majority improperly relieves the People of their responsibility "to come forward with available evidence of explanation and justification, so as to enable the court to determine whether the county is doing all that can reasonably be expected to achieve the constitutional goal mandated in *Wheeler.*" (*People* v. *Buford* (1982) 132 Cal.App.3d 288, 299 [182 Cal.Rptr. 904].) The burden on the defendant is not to *prove* that the fair cross-section requirement has been violated, all he need establish is a prima facie case. (*Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 586-587, 99 S.Ct. 664].) This he has done.

The majority reasons that the discrepancy shown between the number of blacks in the weekly jury pools (which averaged 3.76 percent) and the eligible blacks in the county population (8.1 percent) is inadequate because it is significantly smaller than the discrepancy alleged in *Duren,* where only 15 percent of jury venires were women despite the fact that women composed 53 percent of the eligible population. This invidious comparison renders the principle of *Duren* a dead letter except as to the most egregious of violations. Nothing in the opinion in *Duren* indicates that the principle was intended to be so limited.

Defendant has shown that during the relevant period that was examined eligible blacks comprised *less than half* their percentage of the county population. The significant discrepancy evidenced by this statistic, which is undisputed, seems to me a prima facie indication of unconstitutional underrepresentation that is certainly sufficient to shift to the prosecution the bur-

den of explanation. As stated by the Fifth Circuit, "If a fair cross-section is consistently lacking, then, *without more,* it is established that the [jury] commissioners have failed in their duty." (*Rabinowitz* v. *United States* (5th Cir. 1966) 366 F.2d 34, 58, italics added.)

The new procedures instituted by the Contra Costa County jury commissioner subsequent to the decision in *Buford,* to which the majority attaches great significance, do not in my opinion represent all that can reasonably be expected to achieve the constitutional goal of truly representative juries. For one thing, as demonstrated by the statistics introduced by defendant, the new procedures have failed to produce a fair cross-section of the population. Furthermore, these procedures represent far less rigorous remedial action than is authorized by law. For example, Code of Civil Procedure section 204.3, subdivision (b), provides that "Any person who fails to return a completed juror questionnaire as instructed *shall be summoned* to appear before the jury commissioner to fill out the questionnaire." (Italics added.) Section 225 of the same code provides that any person who fails to respond to the summons referred to in section 204.3 "*shall* be immediately resummoned" (italics added) and that the superior court may order this to be done by the sheriff. At the time of trial, section 238 of the Code of Civil Procedure stated that "Any trial juror summoned, who willfully and without reasonable excuse fails to attend, *may be attached and compelled to attend*; and the court may also impose *a fine* not exceeding fifty dollars ($50), upon which execution may issue."[1] (Italics added.) The county may also ask the court to exercise its contempt power with respect to eligible persons who do not respond to summons or, without a satisfactory excuse, otherwise refuse to serve as prospective jurors.[2]

Measures such as these are admittedly severe; but their severity is warranted by the nature of the evil the Legislature sought to avoid when it authorized their use. The systematic underrepresentation of a racial group, whether intentional or not, deprives the jury system of the broad base it was designed to have in our society. It is a departure from the Constitution of our nation and that of our state. Moreover, as stated by Justice Douglas, "The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the

---

[1] By an amendment to section 238 that became effective on January 1, 1984, the amount of the fine that may be imposed on a juror who without reasonable excuse fails to attend was *quintupled* to $250. This amendment bespeaks a rigorous legislative intent that is inconsistent with the relatively indulgent attitude of Contra Costa County authorities.

[2] The use of the contempt power in such instances is not forbidden by *Bobb* v. *Municipal Court* (1983) 143 Cal.App.3d 860 [192 Cal.Rptr. 270], because a principled reason for the refusal to serve will not have been provided. (See also *United States* v. *Hillyard* (E.D. Wash. 1943) 52 F.Supp. 612.)

democratic ideal reflected in the processes of our courts." (*Ballard* v. *United States* (1946) 329 U.S. 187, 195 [91 L.Ed. 181, 187, 67 S.Ct. 261]; see also *Bobb* v. *Municipal Court, supra,* 143 Cal.App.3d 860, 868-869.)

Whether, when measured in this light, the Contra Costa County procedures constitute all that can reasonably be expected to achieve the constitutional goal presents a serious issue. As indicated, I am strongly inclined to the view that the procedures do not represent a serious effort and are inadequate. (Cf., for example, the procedures discussed in Macauley & Heubel, *Achieving Representative Juries: A System That Works* (1981) 65 Judicature 126.) In any event, the People were not required by the trial court to justify their procedures as all that can reasonably be done to end the chronic underrepresentation of blacks. This was error because defendant has established a prima facie violation of the fair cross-section requirement. Accordingly, I would reverse the judgment.

A petition for a rehearing was denied November 16, 1984. Kline, P. J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied January 24, 1985. Bird, C. J., and Broussard, J., were of the opinion that the petition should be granted.